*Decisions will be entered under Rule 50.*

COE LABORATORIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50268. Filed June 24, 1960.

*Carl J. Batter, Esq.*, for the petitioner.
*David H. Nelson, Esq.*, for the respondent.

TRAIN, *Judge:* The petitioner claimed refunds and relief from excess profits taxes under sections 721 and 722 [1] as follows:

| Year ended July 31— | Net abnormal income to be excluded under sec. 721 | Refund claimed under sec. 722 |
|---|---|---|
| 1943 | $61,686.79 | $30,486.34 |
| 1944 | 52,188.40 | 31,067.29 |
| 1945 | 63,775.27 | 84,571.89 |
| 1946 | 16,311.78 | 32,397.84 |

The respondent denied the relief claimed, and determined deficiencies in income and excess profits taxes for the years and in the amounts as follows:

| Year ended July 31— | Deficiencies | | Year ended July 31— | Deficiencies | |
|---|---|---|---|---|---|
| | Income taxes | Excess profits taxes | | Income taxes | Excess profits taxes |
| 1942 | $2,243.00 | | 1946 | $8,698.13 | $37,929.26 |
| 1943 | 7,410.53 | $3,429.17 | 1947 | 21,138.76 | |
| 1944 | | 100,044.69 | 1948 | 14,765.64 | |
| 1945 | | 90,739.19 | 1949 | 2,483.33 | |

---

[1] All section references are to the Internal Revenue Code of 1939, as amended.

Respondent further determined that petitioner was liable for an addition to tax in the amount of $112.15 under section 291 for failure to file a timely return for the year ended July 31, 1942, which determination petitioner concedes the correctness of. Both petitioner and respondent have conceded certain other issues, which will be given effect under the Rule 50 computation.

The issues to be decided are:

(1) Whether petitioner derived any net abnormal income during the fiscal years ended July 31, 1943 to 1946, inclusive, of the class described in section 721(a)(2)(C) which is attributable to prior years, so as to entitle it to the relief provided by that section;

(2) Whether petitioner changed the character of its business within the meaning of section 722(b)(4) either during or immediately prior to the base period, and otherwise qualifies for the relief accorded by that section;

(3) Whether petitioner is entitled to amortize over the period of its lease the cost of improvements to its president's Indiana farm for the fiscal years 1944 to 1949, inclusive;

(4) Whether amounts paid by petitioner to its president for rental of his Indiana farm were deductible expenses for the fiscal years 1947, 1948, and 1950;

(5) Whether any portion of the rents paid and deducted by petitioner for the fiscal years 1945 to 1950, inclusive, for properties located on West 62d Street and on Wentworth Avenue were excessive and unreasonable; and

(6) Whether any portion of the salary paid to petitioner's president and principal stockholder was excessive and unreasonable for the fiscal years 1942 and 1946 to 1950, inclusive.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

The petitioner (hereinafter sometimes referred to as Coe) was incorporated in 1928 under the laws of Illinois for the purpose of acquiring the assets and assuming the liabilities of Ernest E. Dalton, an individual who had been doing business as Coe Laboratories.

Petitioner's income and declared value excess-profits tax return (Form 1120) for the fiscal year ended July 31, 1942, which was due to be filed on October 15, 1942, was not filed until October 29, 1942.

Petitioner filed timely income, declared value excess-profits, and excess profits tax returns for the fiscal years ended July 31, 1943 through 1946, and corporation income tax returns for the fiscal years ended July 31, 1947 through 1949. The return for the fiscal year ended July 31, 1950, showing a net loss of $72,137.38, was filed

on December 1, 1950. All the above returns were filed with the collector of internal revenue, first district of Illinois.

During the years here involved petitioner maintained its principal office at 6033 Wentworth Avenue, Chicago, Illinois.

The business of the petitioner is that of compounding impression material for dentists, the wholesale distribution of dental supplies, and the operation of a laboratory devoted to research in the science of dentistry. It keeps its books and files its income tax returns on a fiscal year ending July 31, using an accrual method of accounting. Its base period consists of the fiscal years ended July 31, 1937 to 1940, inclusive.

Ernest E. Dalton (hereinafter referred to as Dalton) was president of petitioner from its inception until his death in August 1935. Immediately after Dalton's death, W. S. Rice (hereinafter referred to as Rice) became president, and continued in that capacity until his own death in 1955.

### Sections 721 and 722.

Prior to 1931, among other activities, petitioner sold gold for use in dental bridgework. Petitioner's net sales, including sales of gold, for the fiscal years 1929 and 1930 averaged approximately $1,191,000 per annum. By the year 1926, Polk E. Akers (hereinafter referred to as Akers) had developed a technique of partial denture engineering. He had come to be associated with Coe Laboratories. In the year 1926, Dalton directed his advertising director, Allan Parsons, to prepare a series of magazine advertisements promoting the Akers technique. As a result, in 1926, there appeared in the August issue of the American Dental Association Journal, advertisements directed to dentists describing, on behalf of 10 different laboratories, the advantages of having those laboratories, as practitioners of the Akers technique, construct partial dentures for the dentists' clients. The arrangement between Coe Laboratories and such laboratories sponsoring the Akers technique was that Coe would pay for 50 per cent of the cost of the journal space, and each laboratory (whose name appeared always at the bottom of and sometimes in the page of advertisement) would pay 50 per cent of the cost of that page. The Akers technique involved a gold casting; Coe Laboratories' gold was advertised by it as "Coe 4 Gold." In the same issue of the journal, petitioner's predecessor had two advertisements promoting the Akers technique, and emphasizing the use of Coe 4 Gold.

Further advertisements and other publications were prepared by Parsons for these laboratories which were sponsoring the Akers technique, and which were advertised in such publication by peti-

tioner as "Certified Akers Laboratories." Some of these publications were directed to the certified laboratories themselves, for their technical information, and others were directed both to them and to dentists, and advertised both a particular certified laboratory, and the advantages of Akers and certain techniques and products developed or marketed by petitioner. These publications originally had placed conspicuously on them an emblem reading "Certified Akers Technicians," "Better Removables"; by 1930 the emblem had been changed to read "Certified Akers Laboratory," "Coe Service." Some of the technicians from these certified laboratories would come to petitioner's laboratories for specialized training, particularly by Akers in the Akers technique, and it would be so claimed in the advertisements. Some of these publications directed to the dentists as advertising for the laboratories were paid for entirely by the laboratories and mailed by them to the dentists in their respective areas. Petitioner also sponsored special and annual conventions for the certified technicians, and its technical personnel took an active part in at least two different dental conventions in different States in 1929.

From November 1928 until January 1930, petitioner published a semimonthly house organ under the name "Coe News." In 1930, petitioner was the only dental supply house preparing and mailing to laboratories and dentists advertising material of an educational nature. The promotional publications were developed by Parsons during his period of employment with petitioner, from June 1926 through the end of 1931. These publications, except for Coe News, were produced and distributed by petitioner at least until Parsons left petitioner's employment. From 1933 to 1938, a mimeographed weekly letter was sent to certified laboratories and in January 1938, the petitioner started publication of CAL (abbreviation for Certified Akers Laboratory) magazine which has since been published monthly. Distribution was made through certain dental laboratories (each of whose imprint it bore) who furnished petitioner with lists of dentists in their own area to whom the magazine was mailed directly by petitioner. Petitioner was reimbursed for substantially all of the cost of publication and distribution by the participating laboratories. Advertising matter contained in the magazine is limited to products sold by the petitioner.

In 1942, the petitioner issued renewal certificates to Certified Akers Laboratories and issued new emblems, each numbered and listed as applying to a particular laboratory.

There were approximately 130 certified laboratories in 1930; in the later thirties and thereafter, approximately 200. From the time they became certified, and during most of the subsequent years,

by reason of their existence and the promotional activities already referred to, the laboratories were an effective sales group for petitioner's products and techniques, at very little financial cost to petitioner.

In either 1931 or 1933, petitioner signed an agreement with Austenal Laboratories, Inc. (hereinafter referred to as Austenal), for the exploitation of a nonprecious metal manufactured by Austenal called Vitallium. Due to the combined pressures of the depression and the coming use of such nonprecious metals, there was not much demand for gold; consequently, at the time petitioner took on the Austenal contract, its gold business practically disappeared. In October 1935, Austenal and petitioner entered into an agreement settling a dispute arising in respect to, and canceling and superseding, the prior contracts.

The agreement further provided, *inter alia:*

4. Austenal is to pay to Coe the sum of Twenty-two thousand ($22,000) dollars in full settlement and discharge of all fixed and special commissions due to Coe, and no further sums shall at any time be due or payable in respect thereto. * * *

5. Coe is engaged by Austenal to perform the following services, and no others:

To use its best efforts to keep and promote harmonious relations between Coe, Austenal and the certified laboratories and to hold the laboratories together as an effective merchandising group and outlet for Austenal products and to encourage the sale and distribution of Austenal's present and future products through the certified laboratories. At all times to speak well of Austenal and Austenal's products.

To conduct its activities at all times in such a way as to promote the good standing of Austenal and Austenal products with the certified laboratories and with other customers, and in the trade in general.

On any exhibits made by Coe at dental conventions, Coe shall give Austenal an opportunity, if Austenal wishes to do so, to join in such exhibits upon Austenal's paying a reasonable proportion of the expense of such exhibits.

To keep and maintain Coe in business as an effective going concern, such continued existence being one of the fundamental inducements to Austenal in entering into this contract, and to the continued performance thereof by Austenal.

All other promotional activities in reference to Austenal products shall be conducted by Austenal, and Coe is relieved of all responsibility therefor, and Coe shall no longer refer to itself as general distributor for Austenal or any equivalent term.

6. The term of this contract shall be four (4) years commencing as of October 1st, 1935 and ending September 30th, 1939.

7. In addition to the aforesaid fixed payment hereinbefore provided for, Austenal shall pay to Coe the sum of Five thousand ($5,000) dollars per year commencing as of October 1st, 1935, for the term of this contract or until the same shall be terminated under any provision hereof. * * *

8. During the term of the contract Coe Laboratories, Inc. shall not engage in the manufacture and/or sale of dentures or denture parts made of nonprecious metal alloys and investments used for the manufacture of said den-

tures, (and shall not sell or offer to sell to Austenal licensees such other items as Austenal's licensees are required by Austenal licensing contracts to purchase from Austenal) ; and shall not act as distributor for any other concern in respect to such products and shall not manufacture, sell or otherwise deal in any of said products directly or indirectly, or be interested directly or indirectly in any concern dealing in such products directly or indirectly; and will not directly or indirectly do anything to prejudice the good will of the business in said products conducted by Austenal and the certified laboratories. * * *

9. Austenal agrees during the term of this agreement not to enter into the general dental laboratory supply business. * * *

10. (a) It is recognized that Austenal's Vitallium customers at the present time are limited to certified laboratories subject to certain contractual relationships with certain of said laboratories which are licensed to manufacture and sell under Austenal's patents. Coe has been creating certified laboratories by granting to laboratories a certificate of their certification along with a certain emblem which the certified laboratories are entitled to display and use. It is intended that at all times there shall be not less than the number of certified laboratories which are now in existence. It is also intended that in certain territory in which there are now no certified laboratories (hereinafter called virgin territory), or an insufficient number of certified laboratories, new or additional certified laboratories shall be appointed. It is agreed that Coe shall in the first instance have the right to create certified laboratories to fill vacancies where a laboratory ceases to function as a certified laboratory, and also that Coe shall have the first chance to appoint new certified laboratories in virgin territory. If Coe shall fail to appoint to fill a vacancy, or fail to appoint in virgin territory within a reasonable time after written demand by Austenal, Austenal shall thereupon have the right to nominate a laboratory to receive the Coe certification and emblem and Coe must thereupon appoint such laboratory as a certified laboratory. * * *

Prior to 1930 various materials such as beeswax, plaster of Paris, and some so-called compounds were used for taking dental impressions. These were inelastic and unsatisfactory for various reasons. They had to be broken to be removed from the mouth. With plaster, unless breaking were done at exactly the right instant, the material would set and would have to be cut out, with discomfort for the patient. This difficulty was accentuated because every batch of plaster was different in its characteristics.

The first elastic impression material which could be removed from the mouth in one piece was developed in England prior to 1928. It was a reversible hydrocolloid made from agar-agar, a product manufactured from a seaweed found only off the coast of Japan.

In 1930, the agar-agar product was marketed in this country under the original Poller patents (United States Patent No. 1,672,776 of June 5, 1928) by L. D. Caulk Company of Milford, Delaware (hereinafter referred to as Caulk), under license from Amalgamated Dental Company, Ltd. of England, using the trade name "Dentocoll."

Petitioner has always been in the denture impression material field and maintained for that and other purposes a substantial research staff composed of 15 to 20 people. Frequent meetings on progress of research matters were attended by from 3 to 12 persons, first in Akers', then later in Rice's office. From 1928 to 1955, inclusive, 31 patents were applied for by petitioner's assignors or employees and 19 were granted. None pertained to impression materials prior to 1941 with the exception of an application in 1938 by James Varley, for improving the softening rate and convenience of reversible impression material, which was dropped in 1941.

Various research activities were carried on almost continuously throughout petitioner's existence. Considerable testing of impression materials, including potato starch plaster, elastic compounds, Solvite, Mars wax, hydrocolloids, and latex, was carried on from 1930 to 1934, inclusive. Almost all of these materials were sent in by other laboratories, including some certified laboratories, and other researchers. The testing of such materials was not basic research, but was an attempt to find out something about competitors' products, and to discover products that would be superior to what petitioner was marketing. The basic research, the actual theorizing and compounding of various elements or plasters, would often result as a consequence of such testing.

Solvite was an impression material made from plaster and potato starch. It was manufactured by the Harry J. Bosworth Company, and marketed by petitioner's predecessor as early as 1924. Eventually, petitioner developed its own plaster impression material which was superior in that it broke sharply but was weak enough to break out of the mouth even after it had set completely. This latter development took place during the initial employment period, from 1925 to 1932, inclusive, by petitioner of Charles J. Ringle (hereinafter referred to as Ringle), a research chemist and Rice's assistant.

During 1936, Ringle returned to petitioner for 6 months for the express purpose of working on the agar-agar hydrocolloid materials. This research proved unsuccessful; consequently, petitioner purchased an agar-agar hydrocolloid material from the Surgident Company of Los Angeles which it began to market in November 1936 under its own brand name of "Coe-Loid."

In December 1938, petitioner contracted with Meyer Colb of Brooklyn, New York, for petitioner to market an impression material for full dentures which Colb invented and produced. Petitioner's sales of this product began in 1939, under its own trade name "Coe-Trans."

During the 1930's, available impression materials consisted mainly of plaster (put out by several organizations including petitioner), soluble impression plasters, modeling compounds, and the agar-agar materials. The latter were sold by seven different companies, including Coe and Caulk. Caulk had the outstanding agar business at that time.

In the last week of December 1939, Ringle, while working in Buffalo, New York, and no longer employed by petitioner, received a powder and water impression material from Rice for testing. It was not a satisfactory material, in that it did not take a good impression, and did not gel very well. Ringle thought that the material was an alginate, but was not certain. However, in May or June of 1941, he received an alginate impression material from Rice, which was similar to the material received in 1939. Rice asked Ringle to take an impression with this material, and make duplicate models.

The agar-agar hydrocolloid reversible impression materials differ overtly from the alginate materials in the manner of their gelling and setting. The agar-agar material hardens with cooling, and is made semifluid and fluid by heating, that is, it is a "thermoset" material and "reversible" in that this process can be repeated. Therefore, it is necessary to cool the warm or hot material in the patient's mouth in order to get it to gel. The alginate material forms a gel due to a timed chemical reaction, that is, it is a "chemoset" material. It is not reversible. Unlike agar-agar, alginate is an extract from a giant sea kelp, technically known as *Macrocystis pyrifera*, which is harvested in the Pacific Ocean off the coast of San Diego, California. The colloid is removed in the form of alginic acid, which is reacted with sodium or potassium or one of the alkaline compounds to form the respective salt.

Vance V. Vallandigham (hereinafter referred to as Vallandigham) joined petitioner on April 1, 1940. His first duties were to put petitioner's laboratory into operating condition and to work on denture bases, resins, waxes, and various types of molding materials. On May 6, 1940, Rice gave him a list of instructions covering projects to be worked on, such as a modeling compound, base plate wax, a formula for duplicating Coe-Trans, denture bases, investment materials, and base plates. Project 7 stated:

Our present Coeloid should be duplicated. A substitute for Coeloid—an elastic impression material—is being worked up now. This field should be exhaustively explored and project completed as soon as possible.

The background for the preceding instruction was that petitioner's practice of purchasing agar-agar impression material from another supplier and packaging it under its own name had not been a very

profitable venture, but merely served to keep it in the field competitively. The purpose of this project was to enable petitioner to manufacture the agar-agar impression material in its entirety. No mention was made at this time of any work in alginate materials; and Vallandigham was unaware of any such research being conducted.

Pursuant to Rice's direction, Vallandigham began working on some method to produce an agar-agar hydrocolloid in petitioner's plant. Initial work, extending over 6 weeks, consisted of searching patent files from the year 1900 and duplicating the formulae so found. He also tested and evaluated competitive agar-agar materials, including Surgident's agar-agar hydrocolloid. In a report to Rice on the latter's compound, Vallandigham indicated that the type of agar-agar used by Surgident must be determined before a satisfactory material could be made.

In another report, dated July 1, 1940, Vallandigham indicated that a thorough investigation must be made of the agar-agar field to determine which, of hundreds of types available, would be suitable. He discussed the properties of a suitable agar. He suggested writing to all suppliers of agar-agar and also obtaining reprints of "Study of Agar Agar II" made in 1930 by Yanagawa, Tetsunasake, and Y. Mishida of Imperial Industrial Research Institute, Osaka, Japan. Petitioner contracted with the Albert Dickinson Company in Chicago to purchase a high-grade agar-agar, known as Kobe No. 1, which Dickinson got from Japan in connection with its business of furnishing agar-agar for bacteriological media.

Sometime in the fall of 1940, research was substantially completed and petitioner was ready to produce its own agar-agar impression material. Vallandigham was charged with production and to this end bought some used equipment consisting essentially of a pressure cooker, an agitator, and a tubing machine used to fill lead tubes (similar to toothpaste tubes) with hot agar.

Actual compounding began in January 1941 which made it unnecessary to purchase the material marketed under petitioner's name "Coe-Loid." In April 1941, the new product was introduced under the trade name of "Coe-Loid 66." Sales of the old material were discontinued. Coe-Loid 66 was superior to Coe-Loid both in flexibility and dimensional stability.

The advent of World War II compelled the Government to limit the use of agar-agar (obtained in the coastal waters of Japan) to military uses, which served to spur the search for a better and cheaper impression material.

On February 17, 1941, petitioner entered into an agreement with Arch Shaw of Canada and Carl Lineer of St. Paul, Minnesota.

Therein Shaw represented that he had invented an elastic impression material using potassium alginate and other designated ingredients (specifying formula and indicating the possibility of variations thereof) ; that he had applied for Canadian patents thereon and that he thought the patents would be granted; that he had assigned Lineer an undivided half-interest in all present and future rights; and that he and Lineer desired to license Coe in the United States and Canada and to help Coe in any tests which it wished to make. The agreement then granted to Coe exclusive right to make, sell, and dispose of "materials embodying or utilizing said invention" in consideration for which Coe agreed to begin manufacture and sale of the material as soon as it was able to procure the necessary materials at reasonable expense. The agreement provided for royalties, but if the formulae proved to be unpatentable or that otherwise Coe would be unable to enjoy the protection and derive the benefit from the exclusive license, then at Coe's option the agreement terminated.

For about a month prior to March 10, 1941, Vallandigham conducted research on a basic formula for an elastic alginate material given to petitioner by Arch Shaw on a visit to petitioner's Chicago plant. His laboratory notes, covering many pages, indicate numerous variants of the algin formulae were tried with differing degrees of success.

Under date of March 10, 1941, Vallandigham prepared a 6-page memorandum for Rice summarizing the results of his extensive investigation over the previous month. It covered the series of tests by which he attempted to make a successful operating marketable type of alginate impression material.

Vallandigham's research work on alginates began about a month prior to the March 10, 1941, memorandum and after Coe-Loid 66 was first produced, although improvement work on the latter continued until he left the company in April 1942.

There were two suppliers for the basic alginates: The Algin Corporation of America and the Kelco Company in San Diego (hereinafter referred to as Kelco). Suppliers for the other materials used in the formula were also contacted and their materials tested. This was necessary because chemicals bearing similar chemical names do not necessarily have the same chemical properties. One of the clues to obtaining a good workable formula was in finding the manufacturer of material having the proper characteristics for formulating, packaging, and marketing.

The materials from the formulae discussed in the March 10, 1941, memorandum were workable in the laboratory but they lacked shelf life and as such were not ready for manufacture and distri-

bution to the dental industry. Work continued thereafter on the basic alginates, particularly on the retarders and accelerators. These controlled the speed at which the gel formed in the reaction between the sodium or potassium alginate and the calcium sulphate.

Work continued through the summer of 1941. Large-scale testing was carried out through the certified laboratories and individual dentists in late 1941 and early 1942. Numerous letters requesting tests were sent out under date of November 6, 1941. After 1942, petitioner continued research and testing in a continuous effort to improve its product.

A mouth impression is negative and in order to be a usable tool for the dentist it is necessary for him to pour a plaster or dental stone model to make a "positive." The formulae which had resulted from work in the spring and fall of 1941 were only fair because the byproducts of the reaction in the impression material were also softening agents for the dental stone settings resulting in surface destruction of the stone which would change its dimensions, making it unusable in preparation of the partial dentures.

The solution to this problem rested in balancing the chemicals in the reaction to eliminate any residual salts which would destroy the set of the stone. Vallandigham discussed with Rice the problems which he had been having in his experiments, and asked that either he be allowed to go to Kelco's laboratories in San Diego, or that one of their technical representatives come to Chicago. Around Thanksgiving of 1941, he went to San Diego, since Kelco had nobody to travel to Chicago.

Vallandigham was in San Diego for about 10 days and a very intensive research program was set up. He made formula modifications and Kelco manufactured alginates to specifications indicated by the tests. One of the alginates found to be most satisfactory was a potassium alginate, in contrast to the alginates of sodium and ammonium discussed in the March 10, 1941, memorandum. Vallandigham brought back about 5 pounds of the successful potassium alginate which he and Kelco had developed in order to continue research. An additional order for a larger supply was then placed with Kelco.

Experiments continued using the newly developed potassium alginate. It still remained to balance the formula, give it actual shelf life tests, and to give it to dentists to make impressions in actual cases. Petitioner coded its experimental samples with designation "C-41," meaning Coe-Loid, in the year 1941.

Early in 1942, steps were taken by Vallandigham to put the impression material into production. He set up a mixer for mixing and blending the dry powder. This was necessary to get a good

admixture of the very finely divided materials: Magnesium carbonate, calcium carbonate, tri-sodium phosphate, and potassium alginate. It was also necessary to add coloring and flavoring for psychological reasons.

Vallandigham left Coe in April 1942 as a direct employee although he continued to work through May on a retainer basis for Rice in order to clean up some of the unfinished jobs. During the span of Vallandigham's employment at Coe, he was the only person who worked on alginate impression materials at the Coe laboratory itself. When he started work in the alginates, he asked Rice whether there was in the company files any previous work along the line of alginates and was told that there was not. Vallandigham himself knew of no such prior research. There were others in the organization who worked on such things as dental stones and gold casting techniques.

Petitioner began to market its alginate-base impression material, under the trade name of "Coe-Loid Powder" in April 1942. Under date of April 2, 1942, Rice wrote to various laboratories enclosing samples of C-41, which he said was to be marketed as "Coe-Loid Powder." He therein indicated his belief that, while earlier samples had proved unsatisfactory in various ways, the enclosed samples were free of prior defects. He stated that, "Because of the emergency which has developed out of the necessity for freezing of agar, we are beginning a slow release of this new material with the hope that the profession will cooperate with us should further slight modifications be found necessary." He asked that the recipient test the samples and report on the results.

Petitioner continued to conduct research throughout the war in an effort constantly to improve Coe-Loid Powder. The basic formula may have been changed as many as 100 times during the 3 years following the product's introduction. Petitioner often encountered difficulty in achieving uniformity of production from batch to batch.

While Vallandigham was employed by Coe, his research accounted for 4 patents, in which he was named patentee, of the 19 assigned to or otherwise belonging to petitioner. One of these patents covered the use of hydrocolloid potassium pectate reacted with calcium sulphate, another the use of sodium alginate reacted with calcium sulphate, and another the use of calcium glucinate and a pectinate, or an alginate, all to form dental impression materials. The fourth patent covered the use of a conditioning agent for the impression material after it was formed; the impression, after it was formed in the mouth, was soaked through the use of zinc sulphate and potassium sulphate, which would permit the setting up of the dental stone which would be poured into it for forming the positive model.

This formula was important inasmuch as it balanced the osmotic pressure of the soluble salts remaining in the dental impression. Further, it provided an accelerating agent for the dental stone which eliminated any possibility of powdering or softening.

On September 26, 1938, a patent was granted to Amalgamated Dental Company (hereinafter referred to as Amalgamated) in Great Britain, assignee of the inventor, Sidney William Wilding. The United States application, No. 295,538, was filed on September 18, 1939, and granted on July 15, 1941, United States Patent No. 2,249,694 (hereinafter referred to as the Wilding patent). This described impression materials made from the alginates of either sodium, potassium, or ammonium combined with calcium sulphate and other chemicals to form a stiff elastic gel and a substantially insoluble calcium compound.

For many years, Caulk and Amalgamated of England had been close friends. Anything that Amalgamated developed in England that would have an American application was presented to Caulk to see if the latter wanted it, and Caulk reciprocated.

In the summer of 1939, the director and the chief of research at Amalgamated came to Caulk to demonstrate their alginate impression material under the Wilding patent (hereinafter referred to as Zelex). They brought samples with them to interest Caulk in the product.

Caulk was of the opinion that at the time it was unsuitable for the American market because it consisted of two powders which necessitated careful weighing on special scales to achieve the correct balance. The material was difficult to handle and set very slowly which increased the danger of inaccuracy due to movement. Caulk considered the material promising, however, and started immediate research thereon in 1939. Because agar-agar supplies had already been denied by the Government, and also as a result of promising developments in its own research on the alginate material, Zelex, Caulk took an exclusive license by Amalgamated under the Wilding patent in the United States on February 5, 1942. This agreement provided for a 10 per cent royalty, was nonassignable, and did not expressly empower Caulk to grant sublicenses.

Intense research was conducted on alginates in 1942 and during the war, but Caulk was unable to produce a really satisfactory alginate material until 1946, when petitioner revealed to it its technical knowledge as hereinafter set forth.

Zelex was not satisfactory with respect to "snap-set" (a term which describes the rapidity of setting after the material is in the mouth) and shelf life. The Wilding patent in and of itself did not provide the methods required to produce a commercially satis-

factory impression material. Amalgamated did endeavor to supply Caulk with more technical knowledge, but this did not result in an acceptable product for the American market.

Petitioner's alginate impression material (Coe-Loid Powder) was first demonstrated to Caulk in Chicago in April 1942 but the home office in Milford, Delaware, did not receive a sample until May 1942. It was reputed to be good and it proved to be satisfactory, at least with respect to snap-set. The question of shelf life could not be determined by Caulk at that time, but it was not so interested in that feature.

Sometime prior to May 1942, Amalgamated cabled Caulk that Rice had written to Amalgamated stating that he had heard that Caulk had been granted a license under the Wilding patent, and asking that Coe be granted a license also. Amalgamated told Caulk that if it found it desirable for Coe to have such a license, Caulk had Amalgamated's permission to grant one. There had been some question as to whether Caulk had this power under the February 1942 license. Coe wrote a letter to Amalgamated dated April 10, 1942, inquiring as to the terms under which Amalgamated would grant a license to Coe, and stating that it knew that Amalgamated might consider the process then used by Coe to be an infringement of the Wilding patent held by Amalgamated. Without waiting for a reply to its inquiry, Coe wrote to Shaw concerning the Wilding patent and its possibly narrow coverage and intimating that Coe could provide substitutes for certain ingredients of the Wilding patent.

Rice and representatives of Caulk met in Caulk's lawyer's office in Washington, D.C., in May 1942, in what was the first meeting between the two with a view to Coe's obtaining a sublicense. The War Production Board, being interested in procuring dental materials for the Armed Forces, learned that petitioner was working on alginate impression materials and wanted it to be a source of supply. When Merrill of the War Production Board learned that Caulk had taken a license from Amalgamated under the Wilding patent, he asked that Caulk grant a license to Coe so that there could be two manufacturers in the United States.

At the time of the May 1942 meeting of Rice and Caulk representatives, Caulk was aware that Coe was already marketing an alginate impression material. By this time Amalgamated had received some of petitioner's material and told Caulk of its belief that petitioner's product constituted an infringement of the Wilding patent, and this belief was stated to Rice at the meeting. Rice did not deny this, but simply indicated that, if it did infringe, he wanted a license. A license was eventually issued on October 27, 1942, from Caulk to Coe at the request of the War Production

Board. It was nonexclusive and nonassignable, providing for a royalty of 15 per cent of the wholesale selling price, or an over-riding royalty of 5 per cent. In an exchange of letters dated May 28, 1943, and July 2, 1943, the parties agreed that no royalties were to be charged on sales to the Government, effective January 1, 1943. This royalty adjustment was embodied in a formal agreement dated September 18, 1944, between Caulk and the United States.

No royalties were paid by petitioner on Government sales of Coe-Loid Powder. A royalty of 15 per cent of the wholesale selling price was paid by petitioner to Caulk on non-Government business from and after October 27, 1942. The royalty was reduced to 10 per cent shortly after October 1947.

It took from May to October 1942 for Caulk to grant petitioner the license because officers of both companies were extremely busy traveling around the country under the upsetting wartime conditions which affected the dental industry as it did other industries. Also, there was considerable correspondence with Amalgamated and negotiations between the parties about the terms of the license to Coe.

On September 12, 1942, Rice wrote to Arch Shaw and Carl Lineer, the material import of which was that under their February 17, 1941, agreement, Shaw—

undertook to deliver to * * * [Coe] copy of the application for letters patent * * * to the Dominion of Canada [and the United States] * * *

that Shaw and Lineer had failed to do so, and that,

it has been made to appear to * * * [Coe] that the invention described * * * is not patentable * * *, so that * * * [Coe] will be unable to enjoy the protection and derive the benefit and advantage of the exclusive right to manufacture and sell said material.

Accordingly * * * [Coe] elects to cancel and terminate said agreement * * *

Vallandigham had seen the Wilding patent and he believed that the original formula which petitioner had received from Shaw and Lineer came from the Wilding patent.

When Caulk granted the license to Coe, it did not impart any knowledge respecting the alginate material, nor did it do so thereafter. Caulk did not come out with its own alginate product until about December 1942. In about the middle of 1942, Caulk believed that it had developed a product with the necessary snap-set but at about the same time discovered that the product lacked shelf life, so, instead of introducing it in the summer of 1942 as had been hoped for, it had been necessary to continue research. Caulk is one of the large manufacturers of dental materials in the United States. By November and December 1942, commercial pro-

duction began because Caulk considered that it had solved the shelf life problem. However, by the spring of 1943, it began to appear that shelf life was still inadequate. Caulk replaced material which became defective in the hands of customers without charge but left the product on the market.

In July 1946, Caulk's plant manager went to Chicago to meet with petitioner's president, Rice. This meeting was arranged at the suggestion of Rice because the shelf life problem of Zelex, Caulk's product, had given a bad reputation to alginates and Rice felt that the whole profession could be benefited if improvement were made in Zelex. The trouble turned out to have been in the quality of calcium sulphate which Caulk had been using. Petitioner suggested that Caulk switch its source of supply to Mallinckrodt Chemical Company in St. Louis, which Caulk did with resulting success.

In the United States, the petitioner was the first company to create and market an alginate impression material for dentistry; that product was satisfactory for the market. Petitioner is considered by Caulk to have been the pioneer in developing alginate impression materials in this country.

Prior to 1948, Stanley E. Noyes was engaged in business in an unincorporated capacity as Dental Perfection Company (hereinafter referred to as Noyes). For many years, this firm had been a leading producer of dental impression material. It allegedly utilized the teaching of the Wilding patent before Caulk got into actual operation under its license from Amalgamated. As early as October 28, 1942, Caulk complained to Amalgamated that Noyes was doing a "land office" business in material that appeared to infringe the Wilding patent.

In May 1945, Amalgamated brought an infringement suit against Noyes which was settled in July 1947. In the final decree, Noyes admitted the validity of the Wilding patent and that he had infringed it, but he was absolved from damages for past infringement upon taking a license from Caulk.

The validity of the Wilding patent was upheld by the United States District Court for the northern district of Illinois, eastern division, in the case of *Amalgamated Dental Co.* v. *William Getz Corporation* (E.D. Ill., May 28 and June 25, 1951; 90 U.S.P.Q. 339).

Substantially all of the alginate impression materials sold in the United States prior to 1946 were sold by petitioner, Caulk, and Noyes. None of the companies sold any alginate impression materials prior to 1942. The following table shows sales in pounds and dollars of alginate impression materials within the claims of the Wilding patent by these three companies for the calendar years 1942 through 1950:

| Calendar year | Sales in pounds | | | Value of sales | | |
|---|---|---|---|---|---|---|
| | Caulk | Noyes | Coe | Caulk | Noyes | Coe |
| 1942 | 7,273 | 9,352 | 7,324 | $37,786.20 | $40,236.02 | $62,776.94 |
| 1943 | 42,435 | 30,841 | 69,153 | 202,167.57 | 134,007.70 | 369,217.82 |
| 1944 | 75,708 | 36,772 | 72,858 | 230,729.74 | 156,030.98 | 354,404.11 |
| 1945 | 72,403 | 50,416 | 61,034 | 245,424.65 | 210,522.93 | 366,609.64 |
| 1946 | 28,571 | 71,014 | 60,362 | 149,745.91 | 297,806.19 | 403,866.30 |
| 1947 | 22,540 | 83,575 | 55,150 | 112,348.22 | 328,364.49 | 377,880.40 |
| 1948 | 22,772 | 106,042 | 57,622 | 105,607.06 | 404,507.55 | 380,943.23 |
| 1949 | 22,629 | 125,881 | 49,752 | 129,693.87 | 463,253.55 | 317,400.11 |
| 1950 | 36,745 | 160,105 | 43,781 | 151,706.05 | 560,135.73 | 277,408.59 |

The petitioner received a higher per pound sales price than either of its two competitors as follows:

| Year | Price per pound to nearest cent | | | Year | Price per pound to nearest cent | | |
|---|---|---|---|---|---|---|---|
| | Caulk | Noyes | Coe | | Caulk | Noyes | Coe |
| 1942 | $5.18 | $4.30 | $8.57 | 1948 | $4.64 | $3.81 | $6.61 |
| 1943 | 4.76 | 4.35 | 5.34 | 1949 | 5.73 | 3.68 | 6.40 |
| 1944 | 3.05 | 4.24 | 4.86 | 1950 | 4.13 | 3.50 | 6.34 |
| 1945 | 3.25 | 4.18 | 6.01 | 1951 | 3.35 | 3.73 | 6.01 |
| 1946 | 5.21 | 4.19 | 6.69 | 1952 | 3.97 | 3.35 | 4.15 |
| 1947 | 4.98 | 3.93 | 6.85 | | | | |

Despite the fact that Caulk's product was unsatisfactory from the standpoint of shelf life during the war, it was possible to sell it because of the great need to replace the agar hydrocolloid, which had become unavailable. When Caulk came out with its alginate in 1942, there was an immediate demand from dentists for the product because the alginates made by Caulk, Coe, and Noyes were the only elastic impression materials available. Caulk's sales in 1944 and 1945 continued high because of the tremendous demand for elastic impression materials during those years. The sudden drop after the war (1946) in Caulk's sales reflected the past problem in quality while Coe's and Noyes' sales remained high because they had always marketed and continued to market good products. Petitioner itself did not feel, in April 1942, that its product was ready to go into the market but because of the shortage of other materials, it decided upon production. Petitioner's research activities in fact became very highly concentrated on alginates after their first introduction.

The succession, historically, in the art of mouth impression materials progressed from plaster of Paris to agar-agar thermoset hydrocolloids to chemoset alginates. There is little in the art of any one of these materials which contributes to the art of another.

In the January 1946 edition of CAL magazine, petitioner's publication, Rice wrote in an article entitled "The Selection and Use of an Alginate Impression Material":

During the war years, many new products appeared on the market as substitutes for some commonly used materials, the ingredients of which had become scarce or unobtainable. One of the many ingredients of dental materials which became scarce and of a high priority was agar-agar, obtained from a certain type of seaweed, which supposedly was obtainable only in Japan. The substitute offered for this material was a soluble salt of alginic acid, known as an *alginate;* alginic acid also is a product of a marine plant, which is very plentiful off the coasts of North America. The alginate impression materials—exemplified by Coe-Loid Powder—can reproduce accurate impressions of considerably undercut surfaces, with much less inconvenience to the dentist and the patient than when the agar material (e.g., Coeloid 66) is used. Furthermore, the substitute material has proved to be better in many respects than the original agar hydrocolloid material, and it is here to stay.

In the January 1947 edition of CAL magazine, Rice wrote in an editorial:

before the war there were no alginate impression materials. The development of this type of material was a direct result of the scarcity of agar, the basic ingredient for the only hydrocolloid impression material used at that time. * * *

After the war, other alginate producers came into the market but acceptance of their products was limited because of lack of quality and inadequate promotion. Caulk, Coe, and Noyes remained as the three principal producers, with leadership varying between Noyes and Coe. Competition is severe among the three. Acceptance of newer rubber base materials has been slow despite their superiority.

Rice was the mainspring of Coe Laboratories. Since 1929, when he became associated with petitioner, Rice had been its director of research, and in 1935 also became its president. He worked long, hard hours. He was very important in the marketing of Coe-Loid Powder through his personal contacts with dealers and with laboratories which made dentures from the impressions taken. He helped formulate advertising material to describe and present it in an attractive way. His influence was very much in evidence as far as development and production were concerned and in the type of package and packaging machinery used.

Rice was enthusiastic about petitioner's products and spent a great deal of time working up presentations to make them salable. He was responsible for making the plant and its equipment a well-regulated, operating industrial establishment and this was one of the important factors in the sales pattern in which the company found itself in 1943. The success of Coe-Loid Powder was due largely to the sales and production efforts of Rice himself.

There is virtually no economic data available with respect to sales and profits in the medical and dental appliance industries. However, the petitioner's own sales and gross profits [2] on items other than those subject to research and development, namely, pre-

---

[2] To the nearest dollar.

cious metals, Coe-Trans, laboratory equipment, miscellaneous merchandise, perforated trays, and Hall's teeth, were as follows for each of its fiscal years ended July 31, 1939 through 1946:

| Fiscal year ended July 31— | Sales | Gross profit | Fiscal year ended July 31— | Sales | Gross profit |
|---|---|---|---|---|---|
| 1939 | $205,068 | $58,212 | 1943 | $365,682 | $110,119 |
| 1940 | 217,215 | 68,776 | 1944 | 592,333 | 192,031 |
| 1941 | 256,580 | 85,800 | 1945 | 581,738 | 180,644 |
| 1942 | 331,373 | 110,251 | 1946 | 708,431 | 229,185 |

The increase in sales of petitioner's products which were not the subject of research reflect the following factors of improvement in business conditions in the dental appliance industry: 1.05196 for the fiscal year 1943, 2.02360 for 1944, 1.50517 for 1945, and 1.51231 for 1946.

When petitioner introduced Coe-Loid Powder, its alginate-base impression material, in April 1942, sales of its agar-agar base Coe-Loid 66 were discontinued as soon as existing stocks were depleted. Sales of Coe-Loid 66 and of Coe-Loid Powder (the latter divided into Government and non-Government sales) for each of the fiscal years ended July 31, 1941 through 1948, were as follows:

| Fiscal year ended July 31— | Coe-Loid 66 | Coe-Loid Powder | | Total Coe-Loid Powder |
|---|---|---|---|---|
| | | Non-Government | Government | |
| 1941 | [1] $13,640.23 | $17,413.61 | | $17,413.61 |
| 1942 | 19,880.65 | 17,413.61 | | 17,413.61 |
| 1943 | 1,858.96 | 135,870.58 | $130,203.01 | 266,073.59 |
| 1944 | | 231,744.78 | 67,675.86 | 299,420.64 |
| 1945 | | 294,227.89 | 123,476.84 | 417,704.73 |
| 1946 | 543.85 | 394,644.74 | 16,438.82 | 411,083.56 |
| 1947 | 2,126.51 | 365,707.92 | 3,154.15 | 368,862.07 |
| 1948 | 1,900.89 | 367,861.37 | 1,439.91 | 369,301.28 |

[1] Includes Coe-Loid sales for part of fiscal year before petitioner began to market Coe-Loid 66.

While research activities were carried on throughout the life of petitioner, basic research on impression materials was intensified and concentrated in the period from 1928 to 1934, inclusive, in 1936 for approximately 6 months, and beginning in April 1940 and thereafter.

Petitioner's experimental expenses for the fiscal years 1941 to 1946, inclusive, were in the following amounts, to the nearest dollar:

| Fiscal year ended July 31— | Amounts | Fiscal year ended July 31— | Amounts |
|---|---|---|---|
| 1941 | $1,948 | 1944 | $2,151 |
| 1942 | 1,019 | 1945 | 668 |
| 1943 | 2,619 | 1946 | 1,724 |

The above amounts do not include any salaries paid to personnel conducting research.

The parties stipulated that if the respondent's theory that only those products which were the subject of research give rise to the class of income described in section 721(a)(2)(C) is correct, the following figures of gross income from and "direct costs or expenses" of such products, and the computations to arrive at what the parties designated as "net abnormal income" are correct:

|  | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|
| a. Gross profit | $239,245.43 | $259,074.20 | $391,126.47 | $378,073.92 |
| b. Less: 125 per cent of prior 4 years' average | 60,040.90 | 121,394.27 | 189,668.85 | 297,832.13 |
|  | 179,204.53 | 137,679.93 | 201,457.62 | 80,241.79 |
| c. Less: Direct costs and expenses applicable to abnormal income | 116,748.33 | 81,862.61 | 123,659.13 | 47,473.10 |
| d. Net abnormal income | 62,456.20 | 55,817.32 | 77,798.49 | 32,768.69 |

Petitioner's net sales and net income (or loss) as reported on its returns for the fiscal year ended June 30, 1929, and fiscal years ended July 31, 1930 to 1936, were as follows:

| Year | Net sales | Net income (or loss) | Year | Net sales | Net income (or loss) |
|---|---|---|---|---|---|
| 1929 | $1,177,182.08 | $99,277.57 | 1933 | $262,241.46 | ($9,521.09) |
| 1930 | 1,204,912.97 | (123,866.84) | 1934 | 261,640.22 | (4,238.77) |
| 1931 | 876,850.11 | (2,981.32) | 1935 | 242,901.88 | 5,372.09 |
| 1932 | 551,053.97 | (13,143.94) | 1936 | 289,608.62 | (5,453.78) |

The net sales and gross income for the years 1939 to 1947, inclusive, from items which were the subject of research were as follows:

| Gross profits | | | | |
|---|---|---|---|---|
| Year ended July 31— | Coe-Loid 66 | Coe-Loid Powder | Calcium | Dental base material |
| 1939 |  |  | $32,466.63 | $10,448.01 |
| 1940 |  |  | 33,206.95 | 7,388.59 |
| 1941 | $7,119.40 |  | 35,441.01 | 2,443.60 |
| 1942 | 12,064.82 | $8,397.37 | 39,931.20 | 3,223.30 |
| 1943 | 1,165.93 | 178,321.56 | 55,784.52 | 3,973.42 |
| 1944 |  | 201,048.82 | 55,032.99 | 2,902.39 |
| 1945 |  | 275,412.99 | 115,664.58 | 48.90 |
| 1946 |  | 316,697.48 | 63,219.17 | (1,842.72) |
| 1947 |  | 253,418.86 | 67,561.83 |  |

| Net sales | | | | |
|---|---|---|---|---|
| 1939 |  |  | $64,120.29 | $26,596.32 |
| 1940 |  |  | 61,771.60 | 17,592.47 |
| 1941 | $13,640.23 |  | 66,907.84 | 6,418.78 |
| 1942 | 19,880.65 | $17,413.61 | 75,900.29 | 9,320.23 |
| 1943 | 1,858.96 | 266,073.60 | 101,729.65 | 9,121.69 |
| 1944 |  | 299,420.64 | 100,167.94 | 7,381.15 |
| 1945 |  | 417,704.73 | 211,416.03 | 3,339.30 |
| 1946 |  | 411,627.41 | 118,403.72 | 1,829.95 |
| 1947 |  | 370,988.58 | 125,344.93 |  |

The parties agree as to the amount of gross profit derived from and "direct costs or expenses" attributable to each item sold by the

570

petitioner during the years 1943 to 1946, inclusive, but disagree as to which items should be considered as those giving rise to the income of the class described in section 721(a)(2)(C).

Only Coe-Loid 66, Coe-Loid Powder, calcium, and dental base material were the subject of "research" by petitioner within the meaning of section 721(a)(2)(C), and only a portion of the income from those items was income resulting from such research, and forming a separate class within that subsection.

Petitioner's net sales, gross profits, and net income as reported on its returns, after revenue agent's adjustments and as adjusted by the respondent in his statutory notice of deficiencies, were as follows for the fiscal years 1937 to 1947, inclusive:

| Year | Net sales | Gross profit | Total income | Deductions | Net income (or loss) as reported on return | Net income (or loss) according to statutory notice |
|---|---|---|---|---|---|---|
| 1937 | $394,112.88 | $121,059.86 | $154,069.86 | 1 $154,398.30 | 2 ($328.44) | |
| 1938 | 382,698.26 | 121,450.83 | 145,314.58 | 164,765.27 | (19,450.69) | |
| 1939 | 332,590.31 | 108,871.78 | 129,295.28 | 129,823.74 | (528.46) | |
| 1940 | 332,758.36 | 120,309.28 | 133,182.69 | 129,935.65 | 3,247.04 | |
| 1941 | 392,826.93 | 143,869.20 | 154,616.61 | 150,986.76 | 3,629.85 | |
| 1942 | 499,782.50 | 191,354.00 | 212,069.33 | 213,013.12 | (943.79) | $10,038.63 |
| 1943 | 781,607.14 | 348,653.36 | 368,059.55 | 310,346.03 | 57,713.52 | 76,454.56 |
| 1944 | 1,036,813.78 | 475,505.86 | 489,271.95 | 338,709.20 | 150,562.75 | 159,313.51 |
| 1945 | 1,214,198.44 | 598,843.92 | 605,134.62 | 415,125.72 | 190,008.90 | 217,263.33 |
| 1946 | 1,240,292.37 | 646,285.80 | 652,009.67 | 464,315.71 | 187,693.96 | 237,615.54 |
| 1947 | 1,126,317.98 | 582,547.77 | 589,497.71 | 550,996.91 | 38,500.80 | 89,580.97 |

1 Shown on return as $153,837.77.
2 Shown on return as $232.09.

The respondent has not allowed any amount of net abnormal income to be attributed to any prior year.

Since it results in the lesser tax without the application of section 722, petitioner is to compute its excess profits credit pursuant to the invested capital method as provided in section 714. That credit for each of the years 1943 to 1946 is as follows:

| Year ended July 31— | Invested capital credit |
|---|---|
| 1943 | $16,581.57 |
| 1944 | 16,098.44 |
| 1945 | 16,410.43 |
| 1946 | 16,583.47 |

Petitioner filed timely applications for relief on Form 991 under section 722 of the Internal Revenue Code of 1939 for the taxable years ended July 31, 1943, 1944, 1945, and 1946, and timely related claims for refund on Form 843 for the taxable years ended July 31, 1944 and 1945.

Petitioner filed a timely claim for relief on Form 843 under section 721 of the Internal Revenue Code of 1939, for the taxable year ended July 31, 1943. For the fiscal years ended July 31, 1944, 1945, and 1946, petitioner has claimed the benefits of section 721 in its returns filed for such years.

*Standard Issues.*

Petitioner's president owned a farm in rural Indiana. In March 1944, he and petitioner entered into an agreement leasing a portion of it, the "lake area property," for 5 years from April 1, 1944, to March 31, 1949, for $4,000, payable $800 per year. The lease contained the following covenant:

And it is Further Covenanted and Agreed between the parties aforesaid, that the lessee shall expend at least Twenty Thousand ($20,000.00) Dollars improving such property so leased, and warrants that no mechanic's liens or claims for mechanic's liens will attach against said property. At the expiration of the term created by this lease, the leased property, together with the improvements thereon will revert to the lessor, and the lessee shall have no claim against lessor for the cost of the improvements made by the lessee.

The lease contained no renewal provisions.

Acting under the terms of the lease, petitioner spent the following sums of money improving the Indiana farm:

*Constructing dam:*

| | |
|---|---|
| Moving dirt and preparatory work | $3,453.61 |
| Labor and materials—concrete work | 10,595.60 |
| Earthen work | 5,150.50 |
| Architecture and engineering | 526.00 |
| Tile work | 130.38 |
| *Railroad car*—net cost after wheel salvage | 2,237.51 |
| Heating equipment | 517.77 |
| Moving car | 700.00 |
| Foundation and cellar | 2,421.26 |
| Plumbing | 632.20 |
| Freight | 46.42 |
| Fencing | 471.17 |
| Cement walks, etc. | 666.13 |
| Insurance | 71.50 |
| Retaining wall | 197.12 |
| Miscellaneous | 453.36 |
| | 28,270.53 |

Petitioner spent the total amount by paying $14,801.75 in 1944 and $13,468.78 in 1945.

The railroad car was an old-fashioned executive car, which had been owned by the Northwestern Railroad, built around 1910. It had been used by the president of the road for private transportation, being a complete unit with bathroom, private bedroom, dining room, living room, and kitchen. It was paneled in walnut. It had a 32-volt wiring system which was changed to 110 volts for using the usual fixtures and to 220 volts for the stove.

The farm was located about 4 miles from Tremont, Indiana, which was served by a railroad. Rice used to drive to the farm, which was located about 50 road miles from petitioner's Went-

worth Avenue plant in Chicago. There was no public transportation to the farm itself. The lake which backed up behind the dam was about 15 acres in size. It was stocked with fish and it was used for fishing, swimming, and boating.

The lake area property was often used by petitioner for meetings of the "CAL" groups, informal meetings and entertainment of visiting dentists, consultants, technicians, and salesmen interested in petitioner's products and techniques, while attending the petitioner's activities during the war and postwar period.

The lake area property was not Rice's home nor was this property leased by him prior to his purchase of it. When Rice first purchased the farm, he used to drive out to it every night, and he occasionally stayed overnight at a tenant house not located on the lake area property.

Petitioner amortized and deducted the cost of these leasehold improvements over the life of the lease as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1944 | $493. 38 | 1948 | $6, 095. 40 |
| 1945 | 5, 427. 35 | 1949 | 4, 063. 60 |
| 1946 | 6, 095. 40 | | |
| 1947 | 6, 095. 40 | | 28, 270. 53 |

The amounts so deducted were disallowed in full in the statutory notice with the explanation that the "leasehold improvements made on the property of W. S. Rice, president of your company, were not used for business purposes." In addition to amortization of leasehold improvements, petitioner paid and deducted the following amounts of rent for the years shown, all of which have been disallowed by the Commissioner:

| Year | Rent paid and disallowed |
|---|---|
| 1947 | $800 |
| 1948 | 1, 600 |
| 1950 | 800 |

The lake area property was not used in petitioner's trade or business; accordingly, neither the amounts deducted as amortizable expenditures, nor the amounts deducted as rent were deductible pursuant to section 23.

Petitioner occupies three buildings adjoined by party walls located on Wentworth Avenue in Chicago. The northern two buildings are located on Fagan's subdivision (and are hereinafter referred to as the Fagan buildings or property); the other building owned by petitioner is on Tillotson's subdivision. Petitioner occupied approximately three-fourths of the floor space of the Fagan buildings from 1928 to 1945, when its cotenant vacated. Prior to 1945, the Fagan buildings were owned by various persons having only the relationship of landlord and tenant with petitioner.

The first Fagan property lease, executed on May 15, 1928, between Kilgallon & Co., an Illinois corporation, as lessor, and Dalton, as lessee, was for a term of 20 years ending on May 31, 1948, unless sooner terminated. Rent was $6,730 annually, for the first 3 years, and $7,600 thereafter. Lessee had the option, until June 1, 1931, to purchase the property for $110,000. A supplemental agreement of July 15, 1931, acknowledged the assignment of the lease by Dalton to petitioner, and amended the lease in certain technical particulars.

In May 1937, another Fagan property lease was entered into by petitioner as lessee, for a term of 4 years, from May 1, 1937, to April 30, 1941. It provided for a total rental of $16,800, $4,200 annually, payable at the monthly rate of $350. As in the prior lease, the lessee was again required to pay all water bills, taxes, and insurance. Lessee was given the option during the term to purchase the property for $60,000, and a further option to extend the lease for 6 years after the expiration of the initial term, rental to be from $350 to $500 monthly, as the parties should mutually agree.

In May 1941, Mary V. O'Brien, as lessor, and petitioner, as lessee, executed a new lease of the Fagan property for a term of 5 years, from May 1, 1941, to April 30, 1946, for a total rent of $18,000, $3,600 annually, payable at the monthly rate of $300. As in prior leases, petitioner was required to pay for water, taxes, and insurance. The lease contained no renewal option or option to purchase.

Petitioner had been notified in 1945 by the lessor that she intended to either sell the property occupied by petitioner or renegotiate the lease. Petitioner tried to find other space by contacting real estate agents and looking at many buildings for rent. Petitioner was unable to find adequate space with the necessary facilities and conveniences, such as a railroad siding and automatic elevators. Petitioner also considered the inconvenience of moving the laboratories and manufacturing facilities as well as the possible loss on the investment in the adjoining property which petitioner had previously purchased. Petitioner's directors decided that if it could continue to rent the Fagan property, and construct a building on its adjoining property, it would have adequate housing for its purposes. After July 1945, petitioner constructed a building on the adjoining property.

On or about July 1, 1945, the two Fagan buildings were purchased by Rice's wife and Colette Dalton (hereinafter referred to as Colette), daughter of one of the two principal shareholders of petitioner, for the amount of $51,884. The seller assigned the 1941 lease to Rice's wife and Colette.

Immediately after purchase of the Fagan buildings, Rice's wife and Colette leased them to petitioner for a term of 10 years beginning July 1, 1945, and ending June 30, 1955.[3] The total consideration was $174,600, payable monthly as follows: $1,200 for each of the months of July 1945 through December 1946 and $1,500 per month for the remainder of the term. The lessors had the privilege, after giving proper notice, to demand that the rent for any immediately following rental year be paid in advance. Petitioner, as lessee, was required to pay water charges and maintain the building in good and secure repair. Unlike the prior leases, the lessors were required to pay for insurance. The lease was silent as to which party paid the real estate taxes, but as a matter of practice, they were paid by the lessors. If lessors at any time received a bona fide offer to purchase the premises, they were required to so notify petitioner who then had the option to purchase at the same price and on the same terms. If petitioner did not exercise the option, the lessors could cancel the lease upon notice to petitioner, within a specified time.

Petitioner's directors did not object to the making of the new lease or to its terms.

Under the 1941 lease, petitioner paid all rents due, $300 per month, until the lease was superseded by the one of July 1945. Thereafter, it paid the amounts due as rent under the new lease, $1,200 monthly through December 1946 and $1,500 monthly thereafter. In the statutory notice, all monthly rentals in excess of $400 were disallowed with respect to this property for the years ended July 31, 1945 through 1950, inclusive.

Real estate taxes on the leased Fagan buildings were as follows for each of the years shown:

| | | | |
|---|---|---|---|
| 1936 | $909.28 | 1944 | $1,668.10 |
| 1937 | 833.82 | 1945 | 1,781.54 |
| 1938 | 871.08 | 1946 | 1,837.22 |
| 1939 | 1,328.44 | 1947 | 1,695.74 |
| 1940 | 1,387.94 | 1948 | 2,121.52 |
| 1941 | 1,442.18 | 1949 | 2,132.14 |
| 1942 | 1,519.46 | 1950 | 2,157.08 |
| 1943 | 1,638.68 | 1951 | 2,608.24 |

Neither Rice's wife nor Colette participated in the negotiations to purchase the property nor in the negotiations of the 1945 lease.

The fair rental value of the property covered by the July 1945 lease, under such lease, with the lessor paying the real estate taxes

---

[3] Stipulation paragraphs 29 and 30 erroneously refer to this term as running from June 1, 1945, to May 30, 1955. The lease, which accompanies the stipulation as Exhibit 14-N, shows the dates as July 1, 1945, through June 30, 1955. Since the paragraphs and the document described therein conflict, it is concluded that the document should control.

of approximately $150 monthly, was $750 monthly during the years in question.

On or about November 1, 1946, Rice's wife and Dalton's widow (who with Rice owned substantially all of petitioner's outstanding capital stock) purchased a 3-story building on West 62d Street, Chicago, for the amount of $24,125. On December 23, 1946, they leased the premises to petitioner for a 10-year term beginning on January 1, 1947, and ending December 31, 1956, for a total consideration of $90,000 payable at the rate of $750 per month. Petitioner actually paid only $341 for the month of January 1947, and the prescribed rental thereafter. The rental rate for the 62d Street property was established at one-half the rental for the Wentworth Avenue property because it had about one-half the floor space.

Under the lease, the lessee was required to pay for water and to maintain the property in good repair. The lessors were required to insure the property. The lease was silent as to who paid real estate taxes. The lessors, upon giving notice, were entitled to have rent paid a year in advance. Lessors also had the privilege of canceling the lease if they received an acceptable offer to purchase, but petitioner had the option of purchasing the property on the same terms.

In the statutory notice, all rental payments in excess of $200 per month were disallowed with respect to this property for the fiscal years ending July 31, 1947 through 1950.

The fair rental value of the property located on West 62d Street, under a lease for a term of 10 years starting on or about January 1, 1947, was $350 per month during the years in question.

Rice was a graduate of Ohio Dental College. He practiced in Kentucky and then became an officer in the United States Army in 1913. Rice was personnel director of the Dental Corps during World War I and also dental officer of the VI Army Corps of the American Expeditionary Forces, and after the war became Commander of the Army Dental School and Chief of the Dental Service at Walter Reed Medical Center, Washington, D.C.

In 1929, Rice was hired by petitioner as general manager in charge of its research and development department. According to the employment contract dated October 28, 1929, he was to receive a salary of $10,000 plus specified royalties, which were never to total less than $10,000, on certain products sold, for a minimum annual compensation of $20,000. These products included dental solders, inlay gold, crown gold, separating mediums (except solvites), spatulators, automatic casting machines, temporary base plates, waxes, casting dies, and all substances manufactured for the company by Thomas A. Edison Company, U.S. Gypsum Company, or E. K.

Medical Gas Laboratories Co. In addition, he was to receive a royalty on any patents, processes, formulae, or techniques, which under the agreement Rice was required to transfer to the company. The latter included all patents and processes which he had developed prior to taking employment with the company and any which he might develop while with the company insofar as they related to the profession of dentistry.

The contract was to continue in effect until October 31, 1934, and thereafter until canceled but the specified royalties were to continue even after cancellation so long as the company continued to make sales of the products specified in the royalty clauses of the agreement. Following the death of Dalton in 1935, Rice assumed the additional duties previously exercised by Dalton in light of which the board of directors did not consider the employment contract of 1929 still in effect.

From 1928 through 1955, petitioner, as assignee was granted a total of 19 patents, and was the assignee of 12 patent applications which were not granted. Rice was the inventor listed in 7 of the 31 applications and patents assigned to petitioner from 1928 through 1955. Rice assigned his royalty rights to his wife in 1941, and thereafter received no royalties.

Beginning with the close of 1935 through the year 1950, petitioner's total outstanding shares of capital stock were held as follows:

| Years | Rice | Daltons [1] | Akers | Others | Total | Rice's percentage |
|---|---|---|---|---|---|---|
| 1935 | 275 | 1,509 | 109 | 327 | 2,220 | 12.4 |
| 1936 | 640 | 500 | 109 | 267 | 1,516 | 42.2 |
| 1937 | 665 | 500 | 109 | 224 | 1,498 | 44.4 |
| 1938 | 690 | 500 | 109 | 197 | 1,496 | 46.1 |
| 1939–1940 | 640 | 500 | 109 | 307 | 1,556 | 41.2 |
| 1941 | 651 | 500 | 109 | 294 | 1,554 | 41.8 |
| 1942 | 651 | 500 | 109 | 250 | 1,510 | 43.1 |
| 1943 | 841 | 512 | 117 | 37 | 1,507 | 55.8 |
| 1944–1946 | 841 | 512 | 117 | 10 | 1,480 | 56.8 |
| 1947 | 845 | 512 | 117 | 0 | 1,474 | 57.3 |
| 1948–1950 | 841 | 512 | 117 | 0 | 1,470 | 57.2 |

[1] Dalton in 1935; thereafter Dalton's estate and his widow, Coe J. Dalton.

While Rice did not acquire the majority interest in petitioner until 1943, he held the largest single block of petitioner's stock since 1936.

Prior to the time Rice purchased control of the petitioner and assumed the presidency, he was strictly in charge of research and was not located in the building where the petitioner maintained its main offices. Upon assuming the presidency of the petitioner, he became responsible for its complete operation, finances, sales, research, production, "everything that went with the management of the company."

Rice had been most keenly interested in developing Coe-Loid Powder and he had a very important role in marketing it when sales began increasing in 1942 and 1943. He made personal contacts with dealers who sold the product and the laboratories who made dentures. He helped formulate advertising and concerned himself with the production and development of the material, the machinery and equipment to package it, and the type of packaging used. He worked hard and long hours. Rice was the mainspring of the petitioner and entirely responsible for the development and merchandising of Coe-Loid Powder from 1942 through 1945.

Rice's compensation was fixed each year by the board of directors, and at none of its meetings was there any dissent to the salaries voted. At the board of directors meeting setting Rice's salary for the fiscal years 1945, 1946, and 1947, the directors attending were Rice, Akers, Coe J. Dalton (Dalton's widow), and William T. Harper. The meeting setting his salary for 1948, 1949, and 1950 was attended by Dalton's widow, Rice, and Harper. Harper had been appointed a director in 1939. He held 10 shares of stock.

Total officer's compensation, Rice's salary and amounts of it disallowed by respondent in his statutory notice, Dalton's salary, and petitioner's net sales and income (or loss) as reported on its returns, for the fiscal year ended June 30, 1929, and fiscal years 1930 to 1950, inclusive, were as follows:

| Year | Total officers' compensation | Rice's salary | Dalton's salary | As reported on returns | |
|------|------|------|------|------|------|
| | | | | Net sales | Net income (or loss) |
| 1929 | $30,993.34 | | $18,333.34 | $1,177,182.08 | $99,277.57 |
| 1930 | 46,118.46 | $9,134.25 | 19,833.33 | 1,204,912.97 | (123,866.84) |
| 1931 | 31,521.20 | 8,209.99 | 12,712.83 | 876,850.11 | (2,981.32) |
| 1932 | 24,759.03 | 6,722.61 | 12,737.59 | 551,053.97 | (13,143.94) |
| 1933 | 16,870.84 | 4,325.43 | 8,651.24 | 262,241.46 | (9,521.09) |
| 1934 | 10,765.00 | 2,700.00 | 5,400.00 | 261,640.22 | (4,238.77) |
| 1935 | 14,945.00 | 3,600.00 | 7,200.00 | 242,901.88 | 5,372.09 |
| 1936 | 9,920.00 | 4,600.00 | | 289,608.62 | (5,453.78) |
| 1937 | 10,625.00 | 4,800.00 | | 394,112.88 | 232.09 |
| 1938 | 19,202.00 | 6,690.00 | Rice's salary | 382,698.26 | (19,450.69) |
| 1939 | 15,661.00 | 5,145.00 | disallowed | 332,590.31 | (528.46) |
| 1940 | 8,380.00 | 6,000.00 | | 332,758.36 | (195.05) |
| 1941 | 8,400.00 | 6,000.00 | | 392,826.93 | (681.95) |
| 1942 | 33,350.31 | 23,095.31 | $13,095.31 | 499,782.50 | (943.74) |
| 1943 | 40,699.33 | 28,107.33 | 13,107.33 | 781,607.14 | 57,713.52 |
| 1944 | 42,115.33 | 28,119.33 | 13,119.33 | 1,036,813.78 | 150,562.75 |
| 1945 | 43,332.81 | 29,556.81 | 14,556.81 | 1,214,198.44 | 190,008.90 |
| 1946 | 56,327.06 | 39,549.06 | 24,549.06 | 1,240,292.37 | 187,693.96 |
| 1947 | 56,495.00 | 41,230.00 | 26,230.00 | 1,126,317.98 | 38,500.00 |
| 1948 | 57,382.80 | 41,830.80 | 26,830.80 | 1,086,430.04 | 20,807.04 |
| 1949 | 57,107.14 | 41,543.14 | 26,543.14 | 925,836.26 | (41,869.87) |
| 1950 | 56,842.00 | 41,266.00 | 26,266.00 | 863,483.06 | (72,137.38) |

Subsequent to Rice's death in 1955, John Nevin became petitioner's president and sales manager. He is not a graduate dentist nor a graduate chemist. His annual salary is $25,000 plus 3 per cent of sales in excess of $75,000 per month.

Petitioner did not, at any time during the period August 1, 1930, through July 31, 1950, pay dividends to its shareholders.

At the close of each of the fiscal years 1937 through 1943, petitioner had a deficit in earned surplus ranging from a high of $96,850 in 1942 to a low of $71,750 in 1937. The earned surplus was $19,402 in 1944, $118,303 in 1945, and $236,778 in 1946. For the entire period from 1937 through 1946, petitioner had a capital surplus of $104,841 and outstanding capital stock, exclusive of treasury stock, in the amount of $111,450.

Prior to its fiscal year ended July 31, 1944, petitioner had no investments except for $200 in 1939. Petitioner had investments in the amounts of $40,000 in 1944, $111,704 in 1945, and $128,785 in 1946.

The salary paid for the year 1942 was a reasonable amount for compensation of Rice's services; the amount of $30,000 is a reasonable allowance for such compensation for each of the years 1946 to 1950.

OPINION.

This case involves the application of section 721, relating to abnormalities in income in the taxable period, and, in particular, the application of section 721(a)(2)(C) dealing, in part, with income in excess profits tax years resulting from research extending over a period of more than 12 months. Section 721(b) provides for the determination of the "net abnormal income" attributable to other taxable years, and section 721(c) provides for the computation of tax in the current taxable year. The applicable portions of section 721 are set out in the margin.[4]

---

[4] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; or

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the

The parties have stipulated amounts designated as "net abnormal income" according to their two conflicting theories respecting the items from which the income of the class described in section 721(a)(2)(C) is to be derived. Petitioner contends that the items should consist of all impression materials marketed by it, namely, Coe-Loid, Coe-Loid 66, Coe-Trans, and Coe-Loid Powder. Respondent contends that only those products which were the subject of research and development by petitioner should be considered. Respondent's contention is correct. Sec. 721(a)(2)(C); Regs. 112, sec. 35.721-7; *Rochester Button Co.*, 7 T.C. 529 (1946); *W. B. Knight Machinery Co.*, 6 T.C. 519 (1946).

In computing the amount of net abnormal income on respondent's theory, the parties followed the method of computation set forth in section 721(a)(3), see Regs. 112, sec. 35.721-1 (a) and (b), and took as the class described in section 721(a)(2)(C), the total gross income from the researched products. However, the totals of the amounts computed were not intended by the parties to be taken as net abnormal income resulting from research and development, and thus possibly attributable in whole or in part to prior taxable years, for they have further stipulated:

The amounts of "net abnormal income" shown * * * do not purport to show how much of the net abnormal income is attributable to research and development as compared to other factors, nor is it intended to show what portion, if any, is attributable to other years. Both of these factors are to be developed at the hearing.

The parties' primary contentions concern the extent and duration of research carried on by petitioner in the development of the alginate impression material, Coe-Loid Powder, and the extent to which that research contributed to the income from that product,

---

amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. In the case of amounts otherwise attributable to future taxable years, if the taxpayer either transfers substantially all its properties or distributes any property in complete liquidation, then there shall be attributable to the first taxable year in which such transfer or distribution occurs (or if such year is previous to the taxable year in which the abnormal income is includible in gross income, to such latter taxable year) all amounts so attributable to future taxable years not included in the gross income of a previous taxable year.

(c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

(2) The aggregate of the increase in the tax under this subchapter for the taxable year (computed under paragraph (1)) and for each previous taxable year which would have resulted if, for each previous taxable year to which any portion of such net abnormal income is attributable, an amount equal to such portion had been included in the gross income for such previous taxable year.

and the following discussion is concerned primarily with this one product.

The petitioner contends that it derived income during the taxable years of the class described in section 721(a)(2)(C) from research and development extending from the year 1930 or at least from the year 1936 through the taxable years. Respondent contends that insofar as the income from Coe-Loid Powder realized during the taxable years is concerned, the only research carried on by petitioner contributing to the development of the product was that done by Vallandigham beginning with his researching of the alginate formula in February 1941. Respondent contends further that the "original" research which gave rise to the income was that done by Wilding, that his patent was valid and workable, and undoubtedly used by petitioner in developing its Coe-Loid Powder. Further, much of the income was due to factors other than research, including "Ramsey" factors. See *Ramsey Accessories Manufacturing Corporation*, 10 T.C. 482 (1948). Thus, respondent concludes, the research done by petitioner accounts for only a negligible portion, if any, of the income realized during the taxable years.

We agree with the respondent.

The petitioner's contention that its research and development from which the income was derived began with impression materials in 1930, or in 1936, or any time prior to February 1941, has not been supported by sufficient evidence. With respect to research carried on by petitioner on impression materials other than the alginates, there is a complete failure to show how such research contributed to the development of the alginate material, the sales of which gave rise to the income in question. Petitioner also attempted to prove that it began researching alginates in the late thirties. Its evidence consisted in part of testimony by its counsel in this case regarding certain memorandum of and conversations with Rice allegedly showing that research was being done on the alginates during this time. No question of credibility is involved; the insufficiency of such testimony rests wholly in its vagueness as to the type and extent of research done, the materials researched, and the success of such research. It is undoubtedly true that some research had been done on an alginate in 1939 by someone, for Ringle did receive a sample of material late in that year which he believed to be an alginate. Ringle was asked by Rice to test the material, and did so. The material was unsatisfactory in several respects. This information is all that appears from the record. Where Rice obtained the material he sent to Ringle is not shown. It could have been developed by petitioner or received from some other researcher. Whether any further research was carried on by peti-

tioner on that material is not a matter of record. No further research on alginates prior to February 1941 has been established. The evidence is wholly insufficient to prove a pattern of alginate research prior to February 1941. See *Crowell-Collier Publishing Co.*, 25 T.C. 1268, 1279 (1956).

It has been stipulated that Coe-Loid Powder was one of the products subject to research extending over a period of more than 12 months. Respondent in effect concedes and we find that Vallandigham conducted alginate material research contributing to the development of Coe-Loid Powder beginning in February 1941 until he left Coe in April 1942, when the product was first marketed. Research to improve the product continued throughout the taxable years. However, almost all of the income resulting from Coe-Loid Powder is attributable to factors other than research.

Perhaps the most important of these other factors is the fact that the alginate impression material formula used by petitioner did not originate with it, but probably with Wilding; petitioner's research consisted primarily of varying the proportions of the materials used in the formula, attempting to locate the proper sources of ingredient having the proper characteristics, such as Kelco, the actual mixing and production of the material, and the determination by testing, of whether or not the material was satisfactory. The existence and use of the formula contributed greatly to the development of Coe-Loid Powder; petitioner cannot claim the prior research leading to the development of the basic formula as part of its own. See *Electronic Mechanics, Inc.*, 15 T.C. 489 (1950); Regs. 112, sec. 35.721–7. Further, even if petitioner's research alone had been responsible for the development of the product, its income from its own production attributable to research would be limited to what it could expect from royalties on equal production upon licensing others.[5] Here, petitioner is obviously not in a position to claim as research income an amount even approximating such royalties, inasmuch as it performed only a part of the research leading to the development of the alginate impression materials. Aside from this, there is further evidence that much of petitioner's income was at-

[5] Regs. 112, sec. 35.721–7 EXPLORATION, DISCOVERY, PROSPECTING, RESEARCH, OR DEVELOPMENT.—* * *

* * * If the taxpayer engages in manufacturing, * * * only such portion of the resulting income as is attributable to * * * research, or development is within the class of income described in this section [721(a)(2)(C)]. For example, the A Corporation develops a patented device and itself manufactures and sells such device. It also permits other corporations to manufacture such device upon payment of a royalty of $10 for each device produced. Income resulting from the development of the device is the sum of the royalties * * * and so much of the income arising out of the sale of the units manufactured by the taxpayer itself as does not exceed $10 for each device so manufactured and sold.

tributable to manufacturing rather than research. Rice's effective leadership in promotional and executive endeavors to which he devoted his full time, and which led respondent to concede the reasonableness of part of his salaries, cf. *Sommerfeld Machine Co.*, 15 T.C. 453 (1950), the existence of the CAL group as an effective merchandising and advertising outlet, the advertising advantages of the monthly CAL magazine, were tremendous influences on the sales of Coe-Loid Powder, and undoubtedly accounted for much of its ability to sell at a higher price than its competitive products. See *Ramsey Accessories Manufacturing Corporation, supra.*

The other two factors contributing significantly to the commercial success of Coe-Loid Powder, independently of the business improvement factors, have been set forth in our findings and need only be referred to here. The shortage of the agar-agar materials during the period involved was a great stimulus to the demand for the alginate materials, and is not reflected in the business improvement factors. The effective decrease in competition in the impression materials field from seven to three producers is amply illustrated by Caulk's commercial success with Zelex during the years 1943 to 1946, when it was an inferior product with respect to its shelf life, as compared to its competitive products. Finally, the business improvement factors, computed on the basis of sales of items not subject to research, for each year must be taken into consideration. See *Sommerfeld Machine Co., supra; Rochester Button Co., supra.*

With respect to the other items subject to research, petitioner has introduced no evidence indicating how much of their income was attributable to research as distinguished from other factors.

Considering and weighing the many factors other than research contributing so significantly to petitioner's income from Coe-Loid Powder, lacking evidence with respect to the other products, and bearing in mind that research continued throughout the taxable years, we are unable to conclude that petitioner realized during the taxable years any significant amount of net abnormal income resulting from research and development that could be attributed to prior years.[6] *Eitel-McCullough, Inc.*, 9 T.C. 1132 (1947); *Producers Crop Improvement Association*, 7 T.C. 562 (1946); see *Steel or*

---

[6] Because research continued throughout the taxable years, petitioner would be entitled to attribute to the prior years 1941 and 1942 net abnormal income of any taxable year resulting from research and development only according to the ratio that research expenses of that prior year bore to total research expenses of the prior and taxable years. See *W. B. Knight Machinery Co.*, 6 T.C. 519 (1946); cf. *Rochester Button Co.*, 7 T.C. 529, 553 (1946). The amounts spent on research in 1941 and 1942 were only 20 or 10 per cent, approximately, of total research expenses for the years 1941 and 1946, inclusive; thus, net abnormal income resulting from research would have to be in fairly large amounts for any significant amount of relief.

*Bronze Piston Ring Corporation*, 13 T.C. 636 (1949); cf. *Ramsey Accessories Manufacturing Corporation, supra* at 488.

Petitioner contends that it changed the character of its business within the meaning of section 722(b)(4)[7] in the following particulars:[8] Cancellation of the Austenal contract in 1935, which imposed certain restrictions and responsibilities on petitioner; the death of Dalton, and the acquisition of working control and management by Rice in 1935; the purchase and sale of Coe-Loid beginning in 1936; the acquisition in 1938 of a license to sell the full denture impression material, Coe-Trans.

Respondent contends that none of these constituted a change in the character of the business, and that, in any event, petitioner has failed to prove that the excess profits taxes finally computed without the applications of section 722 results in an excessive and discriminatory tax.

We agree with the respondent.

There is no proof that Rice changed basic management policies of petitioner when he acquired control in 1935; research and sales of impression materials had been carried on by petitioner for many prior years. The introduction of Coe-Loid and Coe-Trans were necessary additions to petitioner's impression materials in an industry where such changes were continuously being made and fulfilled the same function in an improved manner:

A product or service is different * * * if the trade custom or practice treats it as a product * * * of a different class. A mere improvement in the product * * * does not constitute a difference * * *. [Regs. 112, sec. 35.722-3(d)(2).]

*Pelton & Crane Co.*, 20 T.C. 967 (1953); *Avey Drilling Machine Co.*, 16 T.C. 1281 (1951). Further, even assuming a difference in products, the change, "to be considered substantial, must be reflected in an increased level of earnings which is directly attributable to such change." Regs. 112, sec. 35.722-3(d). While petitioner's sales

---

[7] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

　　＊　　　　＊　　　　＊　　　　＊　　　　＊　　　　＊　　　　＊

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. ＊ ＊ ＊

[8] Petitioner also alleged certain other changes of a minor character with respect to which we have not chosen to make findings.

of these products were increasing after their introduction, petitioner's earnings picture at the end of its base period was very dismal and, applying the 2-year push-back rule, we do not find that earnings would have been sufficient to give rise to a constructive average base period net income resulting in an excess profits credit greater than that allowed petitioner pursuant to section 714.

Finally, the CAL Laboratories existed as merchandise outlets for many years prior to introduction of the monthly CAL magazine in 1938; basically its introduction was only a change and increase in advertising and did not constitute a change in the character of the business. *Napco Industries, Inc.*, 30 T.C. 198 (1958); *Acme Breweries*, 14 T.C. 1034 (1950).

Petitioner also claims relief pursuant to section 722(b)(5); however, it relies basically on the same facts which we found insufficient as a basis for granting relief pursuant to section 722(b)(4). Thus, petitioner has not introduced "any other factor affecting" its business as required by subsection (b)(5). Its claim is, therefore, without merit.

Petitioner has failed to prove that the "lake area property" on Rice's farm was "used in the trade or business" within the meaning of section 23(1)(1), providing a reasonable allowance for the exhaustion, wear, and tear of such property. Rice's majority stock interest subjects the transaction to scrutiny, particularly since petitioner was enjoying its first year of very substantial earnings when the lease was entered into. The only testimony respecting the property was by one of petitioner's officers to the effect that the property was often used by petitioner as set forth in our findings. However, while "often" so used, the extent, duration, and frequency of such use was not set forth in any particularity. Further, considering the terms of the lease, the substantial amount required to be spent by petitioner, the greater amounts actually so spent on long-term improvements for petitioner allegedly to enjoy for a 5-year period, with neither rights of renewal of the lease nor any rights in the improvements, and the distance from petitioner's place of business, with little or no public transportation available, we conclude that the basic purpose of such improvements was not their use in petitioner's trade or business. Under the circumstances, petitioner has failed to prove sufficient use of the property to justify allocation of any part of the costs of the leasehold improvements on the theory of partial use for business purposes. The fact that petitioner's president did not use it for a personal residence, although very relevant, does not prove that the premises were used for business purposes. See *A. R. Calvelli*, 43 B.T.A. 6 (1940); cf. *Robert H. Montgomery*, 37 B.T.A. 232 (1938); *Simons Brick Co.*, 14 B.T.A.

878 (1928). Petitioner has cited no authority for his contention that on facts similar to these, the property was held to be used in the trade or business within the meaning of section 23(1)(1), and we have found none.

For the same reasons, we hold that the rental payments were not "ordinary and necessary expenses * * * required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * *" as provided in section 23(a) (1)[9] and the respondent correctly disallowed all deductions with respect to the "lake area property."

The leases of the Wentworth and West 62d Street properties were not entered into at arm's length, because of the substantial holdings of petitioner's stock by the lessors, and the relationship of one of the lessors to Rice, the majority stockholder; consequently, the amounts of rent provided for therein are subject to the inquiry of whether they represented the fair rental value of the properties. *Roland P. Place*, 17 T.C. 199, 203 (1951), affd. 199 F. 2d 373 (C.A. 6, 1952), certiorari denied 344 U.S. 927 (1953). Our findings with respect to the fair rental values of these properties are based on the testimony and other evidence of record; only those amounts constitute deductible expenses [10] for the years in question.

In determining amounts constituting reasonable allowances [11] for compensation for Rice's services, as set forth in our findings, we have given consideration to many factors, among which the following are the most important in overcoming the presumptive correctness of the respondent's determination: The respondent's concessions with respect to the entire amounts of salary paid in the years 1943, 1944, and 1945, and part of the salary in 1946; our finding, as previously set forth, with respect to Rice's role in the development and marketing of Coe-Loid Powder, given considerable weight in our determination of the section 721 issue, and especially important for the year 1942, Rice's training, experience, and other qualifications useful in his position with petitioner, and the extent of his services rendered on behalf of petitioner. Finally, his long employment by petitioner at a salary below that specified in his employment contract entered into when he was not a stockholder,

---

[9] See footnote 10, *infra*.

[10] Section 23(a)(1) provides that in computing net income there shall be allowed as deductions the ordinary and necessary expenses in carrying on a trade or business, "including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

[11] Section 23(a)(1) provides that in computing net income, a deduction shall be allowed for ordinary and necessary expenses of a trade or business, "including a reasonable allowance for salaries * * * for personal services actually rendered." Regulations 111, sec. 29.23(a)-6(3), provide that: "In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances."

a salary which prevailed even after he had taken on additional du-' ties in 1935, its meagerness owing to petitioner's poor financial status rather than to lack of qualifications or services rendered by Rice, must be considered. However, militating against petitioner's contention that the entire amounts paid were reasonable is its failure to pay dividends after the year 1943, when it was able to do so, and the relationship of Rice's salary to petitioner's net income for each of the years 1947 to 1950, as compared to that relationship for the years 1943 to 1946. Rice was in voting control of petitioner during these years, and the fact that the board of directors determined the amount of his salary for each year must be weighed accordingly. With respect to the evidentiary value of Nevin's salary in subsequent years, petitioner alleged but failed to prove that he was not a majority stockholder.

With respect to the net operating loss issues for the years 1949 and 1950, and the net operating loss carryback from 1950 to 1948, they were dependent upon the resolution of other issues herein, and such amounts will be computed pursuant to Rule 50.

Reviewed by the Special Division as to sections 721(a)(2)(C) and 722.

*Decision will be entered under Rule 50.*