Mackinac Island Corriage Tours, Inc., a Michigan corporation v. Commissioner.
Mackinac Island Carriage Tours v. Commissioner
Docket No. 5253-66.
United States Tax Court
T.C. Memo 1968-128; 1968 Tax Ct. Memo LEXIS 168; 27 T.C.M. (CCH) 614; T.C.M. (RIA) 68128; June 26, 1968, Filed *168 Petitioner rented some 66 city carriage licenses held by its controlling stock-holders, paying them rent for each said license in the amounts of $1,200, $1,550, and $1,500 in the fiscal years 1961, 1962, and 1963, respectively, and petitioner took deductions for said rental payments. Respondent determined petitioner was not entitled to deduct more than $600 rental for each license and it is held petitioner failed to prove it was entitled to greater rental deductions. Walter J. Murray, 1 Woodward, Detroit, Mich., for the petitioner. Robert T. Hollohan, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined *169 deficiencies in petitioner's income tax for the fiscal years ended October 31, 1961, 1962 and 1963 in the respective amounts of $15,673.09, $20,540.45, and $27,379.91. The issue is the amount of payments to stockholders petitioner is entitled to deduct as rent in the fiscal years ended October 31, 1961, 1962, and 1963, where the payments were made under leases wherein the stockholders leased assets to petitioner. Findings of Fact Some of the facts were stipulated and they are so found. Mackinac Island Carriage Tours, Inc. is a Michigan corporation organized on November 24, 1947. Its principal office was at Mackinac Island, Michigan, at the time its petition was filed. The corporation filed its income tax returns for the taxable years ending October 31, 1961, 1962, and 1963, with the district director of internal revenue, Detroit, Michigan. Mackinac Island is a summer tourist island in Lake Michigan, located off the shores of the lower peninsula of Michigan about 300 miles north of Detroit. No automobiles have ever been allowed on the island and the primary means of transportation has always been horse-drawn vehicles. In order to operate such a vehicle, an individual had to *170 obtain each year a license from the City of Mackinac Island and a license from the Mackinac Island State Park Commission. The number of licenses granted by the City and the Park Commission has been maintained at a constant figure for many years. Prior to 1947, the individual licensed by the City and by the State Park Commission could operate his carriage in whatever type of business activity and manner he desired. The conduct of these operations was not satisfactory to the State of Michigan. Several complaints were received from tourists and others about such things as overcharging, price-cutting, using short cuts on established tour routes, the absence of available taxi service during rush hours when carriage operators were able to make more money on scenic drives, unsafe vehicles, and horses not in proper condition. To improve the service to the public the Park Commission, in 1947, required the individual license holders to form a corporation. The result was the formation of the petitioner, Mackinac Island Carriage Tours, Inc. on November 24, 1947. The stated purposes of the corporation were as follows: To acquire, own, maintain and operate a system of transportation of persons *171 and property on Mackinac Island; and for such purpose to buy, sell, lease and encumber real and personal property. * * * The capitalization of the corporation consisted of 55 shares of common stock having a par value of $20. The shareholders of the 615 corporation were those individuals who held licenses granted by the City and the State Park Commission. For each set of licenses (one State and one City) that an individual had, he became entitled to one share of stock. The Articles of Incorporation also provided that no shareholder would be permitted to hold more than 20 percent of the total authorized capital stock. Commencing in 1948, each shareholder of petitioner entered into a lease with petitioner. The first leases provided that the shareholder as lessor would discontinue the operation of his carriage or carriages as an individual, lend his goodwill to petitioner, and allow petitioner to use his carriage or carriages. The petitioner as lessee was to maintain the carriages at its own expense and, in the event of dissolution of petitioner, the carriage or carriages were to be returned to the shareholder. The rental paid by petitioner was to be determined each year and, for *172 1948, was $1,000 per carriage. Provision was made for a reduced rental if petitioner's income did not permit the maximum rental set by the lease. These leases were used until just prior to the 1958 season when a new 20-year lease was executed by each shareholder and petitioner. The lease form used in 1958 and thereafter provided, in part, as follows: THIS INDENTURE, Made this day of , 19 , by and between , of Mackinac Island, Michigan, herein called the Lessor, and MACKINAC ISLAND CARRIAGE TOURS, INC., herein called the Lessee, pursuant to a resolution of its Board of Directors. WITNESSETH: WHEREAS, The Lessor is a shareholder, holding share(s) of common stock in the Lessee, a corporation organized and existing under the laws of the State of Michigan; and WHEREAS, the Lessor owns carriage(s) and corresponding carriage license(s): NOW, THEREFORE, in consideration of the rents hereinafter provided to be due during each fiscal year of the lease, 1. The Lessor does hereby discontinue the use and operation of said carriage(s) as an individual and as part of this agreement agrees to refrain from engaging in the business of operating or having any interest in carriages for hire *173 on Mackinac Island other than as a stockholder of the Lessee corporation, and does hereby agree to lend his good will towards the successful operation of the business of the Lessee, and the Lessor does hereby let and lease said carriage(s) and use of Lessor's City carriage license(s) to the Lessee for the use and benefit of said Lessee; 2. The Lessee shall, after delivery of said carriage (s) to said Lessee, keep said carriage(s) in constant repair, at the expense of the Lessee corporation, and in the event of dissolution of said corporation, said carriage(s) shall be returned to said Lessor without cost to said Lessor; 3. As and for the total annual rental for said carriage(s) for the year 1958 and each year thereafter the Lessee shall pay a maximum rental to the Lessor Twentyfive Hundred Dollars ($2,500.00) per carriage; except that in the event that the Lessee in any year shall fail to earn sufficient income over and above its other operating and capital expenses and reserves, then in that event, the annual rental of said carriage(s) payable to the Lessor herein, and every other like Lessor of carriage(s), shall be reduced to an annual rental within the profits of the Lessee *174 as above computed, each Lessor taking his proportionate reduction in rental for any such year; 4. This lease shall continue in effect for each year after 1957 for a period of Twenty (20) years, and the Lessee shall pay the Lessor the same maximum rental set forth above or the minimum renal These leases were used for the operation of the sightseeing or tour carriages. There were 55 licenses granted annually by the City of Mackinac and by the State Park Commission for the operation of these vehicles. In addition, however, beginning sometime prior to 1961, there were 6 taxi licenses and 5 livery licenses granted each year by the City and these licenses were also leased to petitioner by instruments much like the carriage tour leases. The number of vehicles and licenses in each category had been maintained at a constant figure for many years including fiscal years 1961, 1962 and 1963 involved herein. It was the custom of the City licensing authority to grant licenses each year to the licensor of the previous year. The number of passengers carried and the total annual revenues increased each year. In 1948 petitioner carried 97,031 passengers and had revenues of $191,361.62. In 1963 *175 petitioner carried 176,549 passengers and had revenues of $444,564.80. Petitioner's earned surplus at the close of each of its fiscal years ended October 31, 1961, 1962, and 1963, was $97,055.02, $98,236.61, and 616 $101,011.93, respectively. Petitioner has never declared a dividend to its shareholders. Each year petitioner applied to the State Park Commission for a permit to operate carriages for that year. Also, petitioner applied each year to the City of Mackinac Island for commercial carriage licenses in the name of the individual operators. Actually petitioner took care of the mechanics of having a new City license issued to its stockholders each year in that it made application therefor in the name of its stockholders. Payments have been made by petitioner since 1948 for the use of carriages (in the early years) and licenses belonging to the shareholders. Only in one instance did petitioner refuse to pay the annual rent to a shareholder and that was in 1951 when one of them refused to make his City carriage license available to petitioner. For the years 1948 through 1957, the amount of the annual rental was negotiated each year. Commencing in 1958, however, the rental *176 was fixed by the lease to the extent profits were available. Pursuant to the 1958 lease set forth above, petitioner paid each shareholder who was a party to that agreement $1,200, $1,550, and $1,500 per City license held in the fiscal years 1961, 1962, and 1963, respectively. During the same periods, petitioner entered into lease agreements with the holders of livery and taxicab licenses. Some of these persons were not shareholders of the corporation. One such individual was paid $1,600 for the rental of his taxicab license, another individual was paid the same rental received by the shareholder-lessors for her taxicab and livery licenses, and another person was paid at the same rate as the shareholders for the use of her livery carriage and license. On its income tax returns for fiscal years ended October 31, 1961, 1962, and 1963, petitioner claimed deductions for rental payments for "carriages" and "taxi division" in the respective amounts of $75,801, $85,800, and $97,800. Respondent determined that a portion of these claimed rentals "constituted distributions of earnings rather than rental payments" and he disallowed the deductions to the extent of $40,301 for fiscal year 1961, *177 $49,800 for fiscal year 1962, and $61,800 for fiscal year 1963. Although the leasing instruments recited the lessors were leasing carriages as well as their licenses, the only items of property petitioner leased from its shareholders during the years in question were the City of Mackinac Island carriage licenses. Opinion Petitioner executed written leases with its shareholders under which it paid them $1,200 $1,550 and $1,500 for the rent of their City licenses for the years ending October 31, 1961, 1962 and 1963, respectively. The leases stated petitioner was renting each stockholder's "carriage(s) and use of Lessor's City carriage license(s)" but it cannot be seriously argued that during the years in issue the stockholders owned the carriages petitioner was using. It is true the stockholders turned over their carriages to the corporation when they formed the corporation in 1947. But the carriages had probably all been replaced by the years in issue here. The word "carriage(s)" was still in the leasing instruments and petitioner still called the amounts he paid "carriage rental" on his returns. However, in petitioner's return for the year ending October 31, 1961, petitioner reported *178 it had spent $42,371.43 in the purchase of carriages which it was depreciating on the basis of a 10-year useful life. Aside from some vague testimony by one witness that one of its taxi carriages might be individually owned, there is no evidence that in the years in issue the carriages were stockholder owned. In fact, the corporation makes no argument that in the years in issue the stockholders owned any of the carriages and petitioner introduced no evidence of the value or leasing value of any carriages. Petitioner only sought to justify its rental deductions by introducing opinion evidence as to the value of the City licenses which had been issued to the 40-odd stockholders and leased to the petitioner. Therefore, the leases will be considered by us as leases of the City licenses, which actually, is the way the parties to this case considered them. As pointed out in our findings of fact, the shareholders held all of the City lecenses and one share of stock had been issued for each City license. The majority of the stockholders held but one City license and therefore one share of stock but some had more than one license and a few had as many as five City licenses and therefore five *179 shares of stock. It should also be stated that the rentals received by the stockholders for the rent of their licenses do not include any amount for salary for driving carriages. During the years in issue, 1961, 1962, and 1963, 617 petitioner paid $136,039.83, $143,040.11, and $152,782.33, respectively, for salaries, primarily to drivers apart from what petitioner paid to board the drivers. It was petitioner's evidence that very few of the stockholders drove carriages but if in fact a shareholder did drive a carriage he was paid a salary separate and apart from the rental payment he received for the rent of his license. The corporation deducted the full amount that it paid its stockholders for the lease of their City licenses as ordinary and necessary business expenses in the nature of rent under the provisions of section 162 (a)(3). [1]The corporation argues the deductions were correct in the years in issue because the use of the City licenses was vital to its operation and its stockholders, with what amounts to a vested right in renewable City carriage licenses, could and did charge what it paid them as rental for the use of said licenses. Therefore, the corporation argues, *180 the payments to its stockholders were deductible under the statute as "rentals or other payments required to be made as a condition to the continued use" of the City licenses issued in the individual names of the stockholders. This and other courts have often said such transactions as leases between a corporation and its controlling stockholders should be carefully scrutinized. Where, by reason of the close relationship between a lessor and a lessee, the parties have not dealt at arm's length, a careful examination of the amounts paid to determine their reasonableness *181 and whether they were in fact "required" to be paid is necessary. We stated the test in Roland P. Place, 17 T.C. 199. 203 (1951), affd. 199 F. 2d 373 (C.A. 6, 1952), certiorari denied 344 U.S. 927 (1953), as follows: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. See section 23(a) (1)(A) n1 of the Internal Revenue Code. When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. [Citations and footnote omitted.] As we stated in Coe Laboratories, Inc., 34 T.C. 549, 585 (1960): The leases of the * * * properties were not entered into at arm's length, because of the substantial holdings *182 of petitioner's [the lessee's] stock by the lessors, and the relationship of one of the lessors to * * * the majority stockholder; consequently, the amounts of rent provided for therein are subject to the inquiry of whether they represented the fair rental value of the properties. See also in this connection Ray's Clothes, Inc., 22 T.C. 1332, 1337 (1954) and Shaffer Terminals, Inc., 16 T.C. 356, 362 (1951), affd. 194 F. 2d 539 (C.A. 9, 1952). The question is one of fact. Southern Ford Tractor Corporation, 29 T.C. 833, 842 (1958); Wade Motor Co., 26 T.C. 237, affd. 241 F. 2d 712. The statute allows deductions for rent and the issue is whether the amounts claimed as rent were, in fact, rent or something else such as a gift, distribution of profits, or unreasonable rentals. The issue is whether the corporation was actually compelled to pay the amounts it did pay the stockholders. The City license is merely a contract right giving the licensee the right to conduct a certain business. It is not at all unlike a business franchise, or exclusive distribution contract, both quite common in the business *183 world. The automobile dealer, the beverage distributor, and many others in the retail business, conduct their businesses under contract rights obtained from manufacturers or producers. While the leases purport to lease the use of the licenses the leasing documents in effect assign the licenses, apparently with the full consent of the licensing authority. 618 Respondent makes no argument based on any contention that the property leased was an intangible contract right that could not properly be the subject of a lease. In fact, respondent concedes the licenses were rentable. In the closing portion of his brief filed here, respondent states: The respondent, in the notice of deficiency sent to the petitioner, did, however, allow the petitioner $600 as a reasonable rental to be paid per share for the use of the City licenses. It was felt that these licenses had some value since they were issued each year in the name of the individual shareholders and since the 1958 lease, at least, did provide that these licenses were being leased to the petitioner. The only evidence tending to show the reasonable rental value of the City licenses consists of the testimony of petitioner's two *184 witnesses at the trial, Carl Couchois and Orville Steele, and the deposition testimony of Arthur Chambers. All three of these men were shareholders of petitioner and they have been in the carriage business all their lives. Chambers had been in the business for more than 50 years; Couchois for over 40 years; and Steele for more than 20. Couchois and Chambers were of the opinion that $2,000 was a fair rental value of a carriage license. Steele testified he "would be willing to pay" $2,500 for a license. The witnesses were not talking about the rental of a City license or the rental of a State license but their opinions were the fair rental value of both licenses. Chambers said, "I would think I could make over two thousand dollars." Steele clarified the question asked him about the fair and reasonable rental by inquiring "* * * if I could rent one and have a profit after that?" And, later, he said, "I would be willing to pay, oh, $2,500 for a license * * * and get out busy and make some money." It is to be remembered the petitioner was the only holder of a State license. The testimony of these witnesses along with the stipulated fact that both a City and a State license are necessary *185 to operate a carriage lead us to the conclusion that the fair and reasonable rental value of a City license during the years in question was certainly not more than the $600 allowed by respondent in his notice of deficiency. None of the stockholders could have entered the carriage touring business because they did not have and could not get the necessary State license. This case is much like Utter-McKinley Mortuaries v. Commissioner, 225 F. 2d 870 (1955), affirming a Memorandum Opinion of this Court. There McKinley, the sole stockholder, leased a building from parties named Coleman for $200 a month and immediately subleased it to his corporation for $1,000 a month and the corporation sought deduction of its payments under section 23(a) (1)(A), Internal Revenue Code of 1939, [the antecedent statute of section 162(a)(3), supra] as rent that it was required to pay under the sublease. The Court held the corporation was not compelled to pay more than its stockholder ($200 a month) to obtain the continued use of the building and the amount it paid over that sum was not deductible rent under the statute. In the course of the opinion, the court said: The burden imposed *186 by the statute to permit deductions for rentals is onerous. Taxpayer must have proved to the trial court that the payments were wrung from it by compulsion of circumstances delineated by law. * * * Since McKinley was bound to give to this closely held corporation all the advantages which he obtained by his dealing in its behalf, any sums paid to him by the corporation above those paid by him to the Colemans were not a proper deduction. * * * Since the evidence here shows rather clearly that the stockholders were dealing on behalf of the corporation in securing their annual licenses it might well be argued, under the reasoning of the above cited case, that any sums paid to them by the corporation above those they paid the licensing authority would not be a proper deduction. The record does not show how much a City license cost. The State license cost a dollar. However, respondent has allowed a deduction of $600 per license. It is enough that we hold petitioner failed in his burden to show it was entitled to more. We hold for respondent on the issue presented. Since there were concessions with respect to other adjustments, Decision will be entered under Rule 50. 619 Footnotes
1. Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩