Mackinac Island Carriage Tours, Inc. v. Commissioner.
Mackinac Island Carriage Tours v. Commissioner
Docket No. 5253-66.
United States Tax Court
T.C. Memo 1970-345; 1970 Tax Ct. Memo LEXIS 14; 29 T.C.M. (CCH) 1668; T.C.M. (RIA) 70345; December 22, 1970, Filed *14 Some 20-odd individuals operated 55 sight-seeing horse-drawn carriages on Mackinac Island in Lake Michigan under 55 sight-seeing carriage licenses, one for each carriage, granted by the City of Mackinac Island and 55 sight-seeing carriage licenses, one for each carriage, granted by the Michigan State Park Commission. In 1947 they organized petitioner-corporation to carry on the sight-seeing carriage business on the Island. The Articles provided for the issuance of all of petitioner's 55 shares of stock to the said 20-odd individuals, each receiving a share of stock for each licensed carriage he had operated in the 1947 season. The stockholders leased their city licensed carriages to petitioner and thereafter, beginning with the 1948 season, petitioner operated the sight-seeing carriage business on the Island. The Park Commission granted licenses direct to petitioner each year to operate 55 carriages but the city continued to grant its 55 licenses each year in the names of the former individual operators. The leases in effect in the years in issue provided the stockholder-lessors were leasing to petitioner the use of their city sight-seeing carriage licenses at a maximum annual rental *15 of $2,500 a license which could be less depending on petitioner's profits. During the years in issue petitioner paid the stockholders under these leases for each city license the amounts of $1,200, $1,350, and $1,550 in the fiscal years 1961, 1962, and 1963, respectively, and took deductions for same as rent. Respondent determined petitioner was not entitled to deduct more than $600 annually for each license and it is held petitioner failed to prove it was entitled to more. Held, further, on the evidence presented that petitioner was entitled to deduct as rent the full amounts paid under leases with holders of Class B stock and some nonstockholders wherein they leased four licensed horse-drawn livery carriages in 1961 and five such carriages in 1962 and 1963 and wherein they leased three licensed horse-drawn taxicabs in each of said three years. Walter J. Murray, 1 Woodward Ave., Detroit, Mich., for the petitioner. Robert T. Hollohan, for the respondent. MULRONEY Preliminary Statement MULRONEY, Judge: Our Memorandum Findings of Fact and opinion in this case was filed June 26, 1968 T.C. Memo. 1968-128). Decision pursuant to said Memorandum Findings of Fact and Opinion was entered by this Court on November 5, 1968. The case was appealed to the Court of Appeals for the Sixth Circuit by both parties. On January 6, 1970, the Court of Appeals rendered its opinion 419 F. 2d 1103, (1970)), which ordered the case remanded to the Tax Court for "further action" in accordance with its opinion. Hearing after remand was had in this Court. No new evidence with respect to the issues in this case was submitted by the parties at said hearing and no motion was made by either party for any additional trial or for the taking of any additional evidence. After said hearing we rendered our Supplemental Memorandum Opinion which was filed August 11, 1970, ordering *17 the same decision that had been entered on November 5, 1968, which decision was entered on August 14, 1970. Thereafter on August 28, 1970, petitioner filed its "Motion for Further Hearing and Vacation of Decision" wherein it moved that said decision be vacated and the case reopened to permit it to introduce additional evidence. We granted petitioner's motion by our order of September 8, 1970, vacating the decision entered on August 14, 1970 and setting the case for further hearing for additional testimony. That hearing was had on October 13, 1970 and at said hearing petitioner introduced the additional testimony of three witnesses who had testified in the original trial, and the testimony of five other witnesses and also some documentary evidence. After said hearing the parties filed a "Supplemental Stipulation of Facts" which corrected misstatements in the original Stipulation (filed December 5, 1967) as to the number of leasing agreements and amounts petitioner paid as rents under said agreements during the three years involved. The parties filed briefs and the case is now 1669 before us for opinion and decision on the record containing the new evidence and the correcting Supplemental *18 Stipulation of Facts. The following is our new opinion in the case and order for decision. Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for the fiscal years ended October 31, 1961, 1962 and 1963 in the respective amounts of $15,673.09, $20,540.45, and $27,379.91. The issue is the amount of payments to stockholders petitioner is entitled to deduct as rent in the fiscal years ended October 31, 1961, 1962, and 1963, where the payments were made under leases wherein the stockholders leased assets to petitioner. Findings of Fact Some of the facts were stipulated and they are so found. Mackinac Island Carriage Tours, Inc. is a Michigan corporation organized on November 24, 1947. Its principal office was at Mackinac Island, Michigan, at the time its petition was filed. The corporation filed its income tax returns for the taxable years ending October 31, 1961, 1962, and 1963, with the district director of internal revenue, Detroit, Michigan. Mackinac Island is a summer tourist island in Lake Michigan, located off the shores of the lower peninsula of Michigan about 300 miles north of Detroit. No automobiles have ever been *19 allowed on the island and the primary means of transportation has always been horse-drawn vehicles. Beginning sometime around the turn of the century the Mackinac Island State Park Commission began granting licenses to owners of horse-drawn vehicles to transport passengers for hire around Mackinac Island State Park. Sometime, in a year prior to 1941, these individual operators associated themselves together under the name of Mackinac Island Carriagemen's Association. Thereafter the Commission would enter into a contract with the said association setting forth the license fee for each vehicle, the routes through the park to be traveled and the per passenger charge. These contracts also set forth in much detail the rules and regulations of the Commission that were to be observed by the individual operators, with respect to equipment, liability insurance, and conduct of the drivers. Around 1947 the Commission froze the number of sight-seeing carriages it would license at 55. By the time of the 1947 contract, covering the period May 1, 1947 to May 1, 1948, the name of the drivers' association had been changed to Mackinac Island Carriage Association. This contract provided the license *20 granted by the Commission for each vehicle should be displayed on the rear of each carriage. Paragraph 17 provided in part: It is further agreed and mutually understood by and between the parties hereto that a carriage owner may hold more than one (1) carriage license, to be issued to him in the regular and usual manner as herein prescribed * * *. It is further agreed that the Park Commission or its agent will not permit any carriage whose owner is not a member of the Carriage Association to engage in the business of transporting passengers through State Park property. At this time all of the sight-seeing carriages had to have a city license issued by the City of Mackinac Island costing $120 each. The Commission received many complaints from tourists and members of the public about such things as overcharging, price cutting, using short cuts on established routes, poor equipment and horses not in a proper condition. The Commission felt the service to the public would be improved if the transportation was carried on by a corporation rather than a number of individual operators who were difficult to control. Consequently, the Commission required the individual carriage owners in *21 the Mackinac Island Carriage Association to incorporate. The result was the formation of the petitioner, Mackinac Island Carriage Tours, Inc., on November 24, 1947. The stated purposes of the corporation were as follows: To acquire, own, maintain and operate a system of transportation of persons and property on Mackinac Island; and for such purpose to buy, sell, lease and encumber real and personal property. The corporation operated its transportation business under a 30-year franchise given to it by the Commission as a result of special legislation enacted by the Michigan legislature upon the petition of the Commission. The capitalization of the corporation consisted of 55 shares of common stock, one for each set of city and state sight-seeing licenses, having a par value of $20 per share. The Articles of Incorporation provided that the original shareholders 1670 of the corporation were those individuals who held the 55 city and state sight-seeing carriage licenses. For each set of sightseeing carriage licenses (one city and one state) that an individual had he became entitled to one share of stock. Most of the individual operators held but one set and therefore became entitled *22 to but one share of stock. However, those who were operating more than one sight-seeing carriage under separate sets of city and state licenses became entitled to purchase shares of stock equal in number to their licensed sight-seeing carriages. During the first year of the corporation there were some 20-odd stockholders holding all of petitioner's 55 shares of stock. The Articles of Incorporation limited the transfer of shares of stock by the original stockholders to other stockholders or to members of the transferor stockholder's immediate family or his heirs, without first offering such share or shares to the corporation at the then fair cash value. Petitioner commenced its sight-seeing business with the 1948 season by leasing the 55 sight-seeing carriages from its stockholders. These 1948 leases with stockholders recited that lessor owned a share or shares of stock in petitioner lessee "a corporation organized under the laws of Michigan, to acquire, own, maintain and operate a system of transportation" on Mackinac Island and that lessor owned a carriage or carriages that he had been operating as a member of the Mackinac Island Carriage Association. The leases provided that *23 in consideration of the rent provided in the lease "the Lessor does hereby discontinue the use and operation of said (carriages) as an individual, and does hereby agree to lend his good will toward the successful operation of the business of the Lessee; and the Lessor does hereby let and lease said (carriages) to the Lessee for the use and benefit of said corporation." The leases provided that Lessee was to "keep said (carriages) in constant repair" at its expense and in the event of Lessee's dissolution return same to Lessor. These leases provided the annual rent would be $1,000 per carriage provided, however, that it could be reduced in any year to "rental within the profits of the Lessee." The last paragraph of the lease provided it should "continue for and during the term of the corporate existence and operation of the Lessee." These leases were used until just prior to the 1958 season when a new 20-year lease was executed by each shareholder and petitioner. The lease form used in 1958 and thereafter provided, in part, as follows: THIS INDENTURE, Made this day of , 19 , by and between , of Mackinac Island, Michigan, herein called the Lessor, and MACKINAC ISLAND CARRIAGE TOURS, *24 INC., herein called the Lessee, pursuant to a resolution of its Board of Directors. WITNESSETH: WHEREAS, The Lessor is a shareholder, holding (shares) of common stock in the Lessee, a corporation organized and existing under the laws of the State of Michigan; and WHEREAS, the Lessor owns (carriages) and corresponding carriage (licenses): NOW, THEREFORE, in consideration of the rents hereinafter provided to be due during each fiscal year of the lease, 1. The Lessor does hereby discontinue the use and operation of said (carriages) as an individual and as part of this agreement agrees to refrain from engaging in the business of operating or having any interest in carriages for hire on Mackinac Island other than as a stockholder of the Lessee corporation, and does hereby agree to lend his good will towards the successful operation of the business of the Lessee, and the Lessor does hereby let and lease said (carriages) and use of Lessor's City carriage (licenses) to the Lessee for the use and benefit of said Lessee; 2. The Lessee shall, after delivery of said (carriages) to said Lessee, keep said (carriages) in constant repair, at the expense of the Lessee corporation, and in *25 the event of dissolution of said corporation, said (carriages) shall be returned to said Lessor without cost to said Lessor; 3. As and for the total annual rental for said (carriages) for the year 1958 and each year thereafter the Lessee shall pay a maximum rental to the Lessor Twenty-five Hundred Dollars ($2,500.00) per carriage; except that in the event that the Lessee in any year shall fail to earn sufficient income over and above its other operating and capital expenses and reserves, then in that event, the annual rental of said (carriages) payable to the Lessor herein, and every other like Lessor of (carriages), shall be reduced to an annual rental within the profits of the Lessee as above computed, each 1671 Lessor taking his proportionate reduction in rental for any such year; 4. This lease shall continue in effect for each year after 1957 for a period of Twenty (20) years, and the Lessee shall pay the Lessor the same maximum rental set forth above or the minimum rental as computed above. 5. All provisions in the Articles of Incorporation of the Lessee corporation and the order of the Michigan Public Service Commission, dated October 9, 1947, regulating, limiting, *26 restricting or in any wise affecting the transfer of stock of said Lessee corporation are hereby made applicable to the transfer of ownership of all carriages, it being the intent of the parties hereto that such (carriages) shall follow said stock. The original sight-seeing carriages turned over to petitioner by the shareholder lessors were later equipped with pneumatic tires and hydraulic brakes by petitioner. During the years in issue petitioner operated 55 sight-seeing carriages. Thirtyeight of these carriages would seat 12 passengers, eight would seat 9 passengers and the remaining nine carriages would seat 6 passengers. As previously stated, there were, prior to 1947, 55 city sight-seeing carriage licenses issued each year. After the incorporation of petitioner in 1947 the city continued to issue the 55 sight-seeing carriage licenses in the names of the same individuals who had previously operated sight-seeing carriages as individuals and who had since become the stockholders of petitioner holding all of its 55 shares. In succeeding years there were changes in the ownership of petitioner's shares of stock caused by death of a stockholder or transfers within his immediate *27 family. The city continued to issue its 55 sight-seeing licenses in the names of stockholders with each one being named as licensee in a city sight-seeing carriage license for each share of stock he owned. In some later years, including the years in issue here, there were situations where the city would issue one sight-seeing carriage license in the names of three or four persons described as heirs of a deceased stockholder so that the named persons each had a fractional interest in one city sight-seeing carriage license. During the years in issue here there were in all some 40-odd persons named as licensees in the city's 55 sightseeing licenses who owned the stock interest in petitioner's 55 shares of stock. Each year petitioner applied to the State Park Commission for a permit to operate 55 sight-seeing carriages for that year. Also, petitioner applied each year to the City of Mackinac Island for sight-seeing carriage licenses in the name of the individual stockholders. Actually petitioner took care of the mechanics of having a new City license issued to its stockholders each year in that it made application therefor to the city in the name of its stockholders. Petitioner paid *28 the city the $120 license fee that the city charged for each of the 55 licenses issued in the names of the stockholders or a total of $6,600. The sight-seeing carriages operated from 9 in the morning to 6 o'clock in the evening. Sometime after 1947 and before the years here involved the city began granting licenses for the operation of horsedrawn taxicabs. These vehicles carried passengers from one point on the Island to another. They operate day and night all year around. The cost of the city license for the operation of taxicabs was $100 per vehicle. These operators were also required to secure a state taxicab license for each vehicle from the Park Commission. This license cost $1 per vehicle and the granting was automatic to the holders of city taxicab licenses. Sometime after 1947 and before the years here involved the city began granting licenses for the operation of horse-drawn livery carriages. These carriages were hired to transport persons to scenic places on the Island, charging on a time basis by the hour or fraction thereof and not at a fixed price per passenger. The cost of the city license for horse-drawn livery carriages was $100 per carriage. These operators were *29 also required to secure a state livery license for each vehicle from the Park Commission. This license cost $1 per vehicle, and the granting of the state license was automatic to the holder of a city livery license. The livery carriages operate almost entirely in the months of July and August from 10 o'clock in the morning until 5 o'clock in the afternoon. Sometime in 1958 petitioner issued shares of a new class of stock called Class B stock. The holders of this stock would acquire no interest in case of liquidation in the assets owned by the corporation prior to the issuance of said stock. Some individuals had been operating three city and state licensed taxicabs and three city and state licensed livery carriages. The Class B shares of stock were issued to 1672 these operators and they began leasing their vehicles and corresponding city licenses to petitioner. These leases were in existence during all of the years involved here and one more Class B share of stock was issued in 1962 to an individual operating a livery carriage and his vehicle and this city livery license was leased to petitioner for years 1962 and 1963. During the three years involved petitioner also leased *30 one livery vehicle with its city and state licenses, and two taxicabs with their city and state licenses from two individuals who were not stockholders. It was the practice of the licensing authorities to issue livery and taxicab licenses each year to the holder of such licenses for the previous year. The leases stated no terms and were apparently for one year but the practice was to consider them continuing obligations with the right of lessors to end them at the close of any year. The leases were in effect during all of the years in issue. They called for a flat rent per carriage and it was not keyed to profits. In the years at issue, petitioner paid the following amounts to stockholders and nonstockholders on leases of city licenses from its stockholders and non-stockholders: 1961 From holders of 55 shares of stock issued in 1947:
55 sight-seeing carriage licenses @ $1,200.00
$66,000.00
From Class B Stockholders:
3 Livery licenses @ $1,200.00
3,600.00
1 Taxi license @ $1,600.00
1,600.00
From three non-stockholders:
1 Livery license @ $1,200.00
1,200.00
2 Taxi licenses @ $1,600.00 3,200.00
Total Rent Paid for Licenses
$75,600.00
1962 From holders of 55 shares of stock issued in 1947:
55 sight-seeing carriage licenses @ $1,350.00
$74,250.00
From Class B Stockholders:
4 Livery licenses @ $1,350.00
5,400.00
1 Taxi license @ $1,600.00
1,600.00
From three non-Stockholders:
1 Livery license @ $1,350.00
1,350.00
2 Taxi licenses @ $1,600.00 3,200.00
Total Rent Paid for Licenses:
$85,800.00
1963 From holders of 55 shares of stock issued in 1947
55 sight-seeing carriage licenses @ $1,550.00
$85,250.00
From Class B Stockholders:
4 Livery licenses @ $1,550.00
6,200.00
1 Taxi license @ $1,600.00
1,600.00
From three Non-Stockholders:
1 Livery license @ $1,550.00
1,550.00
2 Taxi licenses @ $1,600.00 3,200.00
Total Rent Paid for Licenses:
$97,800.00
*31 Respondent determined that a portion of the claimed rentals paid by petitioner "constituted distributions of earnings rather than rental payments," the notice of deficiency stating as follows: It is determined that deductions claimed as rental payments for horse drawn carriages and taxis in the taxable years ended October 31, 1961, October 31, 1962, and October 31, 1963, constituted distributions of earnings rather than rental payments and are disallowed as follows: Taxable Year Ended
Total Claimed
Totalallowable
Dis- allowed
Oct. 31, 1961
$75,801.00
$35,500.00
$40,301.00
Oct. 31, 1962
85,800.00
36,000.00
49,800.00
Oct. 31, 1963
97,800.00
36,000.00
61,800.00
At the trial and on brief respondent conceded the total rent allowable as deductions for all of the vehicles and their corresponding licenses for each of the years involved would be $600 per vehicle. The following is a schedule showing the number of passengers carried by petitioner and total revenue for the years beginning with 1958 (the first year of the sight-seeing leases here involved) and extending through the years in issue: Year
Total Passengers
Total Revenue
1958
163,753
$407,525.99
1959
167,387
424,461.40
1960
168,639
425,636.10
1961
150,901
383,623.95
1962
159,305
401,625.75
1963
176,549
444,564.80
*32 It is stipulated that petitioner has never declared a dividend to its shareholders. Opinion Petitioner corporation is engaged in the business of transporting passengers in horsedrawn vehicles on Mackinac Island, both in and outside the City of Mackinac Island. The vehicles it operates have to be licensed by the city and the Michigan State Park Commission. The state licenses (costing $1 per vehicle) are issued direct to petitioner. The city licenses for the 55 sight-seeing vehicles are issued in the names of petitioner's stockholders. The stockholders lease the city licenses that the city issues in their names to petitioner. Petitioner also leased some seven or eight city taxi and livery licenses and some of these licensors were stockholders and some were non-stockholders. The issue here is the amount of the payments petitioner made to its 1973 stockholderlessors under these leases that petitioner is entitled to deduct as rental expenses. The first group of leases involve the 55 sight-seeing carriages and the city licenses for the operation of these carriages. Petitioner was incorporated under the laws of the State of Michigan at the close of the 1947 season (October) by *33 some 20-odd individuals who had been operating 55 sightseeing carriages that they owned under licenses granted to them by the city and the Commission. The Articles of Incorporation provided for the issuance of 55 shares of stock of the part value of $20 a share. The Articles provided the 55 shares of stock were to be issued to persons in accordance with a schedule contained therein. Other evidence establishes that this schedule restricted the issuance of the 55 shares of stock to the then holders of the 55 city sight-seeing carriage licenses with each license receiving shares of stock equal in number to his city sight-seeing carriage licenses. In April of 1948 the stockholders all rented their carriages to petitioner "for the term of its corporate existence and operation." Thereafter, beginning with the 1948 season (May) petitioner has conducted the only sight-seeing carriage business on the Island, using some but not all of the 55 carriages originally turned over to it by the stockholders. [1] The city continued to issue the 55 sight-seeing licenses in the names of petitioner's stockholders. *34 The first leases executed in 1948 had merely provided for leasing the carriages and made no mention of leasing the city licenses. However, there is evidence that it was understood these leases included the corresponding city sight-seeing licenses for the 55 carriages. At any rate, the 1958 20-year leases, in force during the years here involved, specifically provide that lessors are leasing their city sight-seeing licenses. We have set forth the 1958 leases in force during the years here involved in our Findings of Fact. These leases were much like the earlier leases, in that they set forth the stockholding of the lessors, their discontinuing operations as individuals and their pledges to lend their goodwill toward the successful operation of their corporation. These leases provided the lessors' city carriage licenses were being leased "to the Lessee for the use and benefit of said Lessee." In these leases the maximum annual rent was raised from $1,000 per carriage to $2,500 per carriage and, as in the 1947 leases, the annual rental payment could be less than the maximum depending on the corporate earnings. We need not consider the rental value of the sight-seeing carriages for *35 the purposes of this case. Several of petitioner's witnesses, including its officers, testified the carriages were not a significant factor in determining the amount of rent to be paid to the stockholder-lessors. [2]
Petitioner's witnesses testified that the valuable item leased by a stockholder-lessor during the years in issue was the city sightseeing carriage license that was issued by the city in the name of each stockholder each year. The leases all stated the lessors were leasing their carriages as well as their city licenses but petitioner introduced no evidence as to the value *36 or rental value of any carriages that were leased by it during the years in issue and it is admitted the rental payments were for the use of the city licenses. It is petitioner's argument that the full amount of the stipulated payments made to the stockholder-lessors under the leases for the use of the city sight-seeing carriage licenses was deductible under the provisions of sec. 162(a)(3). [3] 1674 It is stipulated that in the years 1961, 1962, and 1963 petitioner paid its stockholders $1,200, $1,350 and $1,550, respectively, per city sight-seeing license it leased. The city charged $120 per sight-seeing carriage license that it issued each year in the names of the stockholders. *37 It is admitted that petitioner paid to the city the license fee for each and all of the 55 city sight-seeing carriage licenses or a total of $6,655 for each of the three years involved. [4]
The cited statute grants the rent payment as a business deduction when the lessor is "required" to make it "as a condition to the continued use" by the lessor of the property leased. When there is no close relationship between the lessor and lessee and the lease is the result of arm's length negotiations it can be said that the terms of the lease govern and lessee is required to make the payments provided in the lease for the continued use of the leased property. Anderson Dairy, Inc., 39 T.C. 1027 (1963); Herbert Davis, 26 T.C. 49 (1956). When, however, the lessor and lessee are closely related, such as a close family relationship or the lessor is the sole or controlling stockholder of lessee, and the negotiations have not been at arm's length, *38 the rental arrangement is to be carefully scrutinized to see if the amounts paid as rent were unreasonable or excessive or actually rent or something else paid under the guise of rent. Limericks, Inc., 7 T.C. 1129, affd. 165 F. 2d 483 (C.A. 5, 1948); Stanwick's, Inc., 15 T.C. 556, affd. 190 F. 2d 84; Roland P. Place, 17 T.C. 199, (1951), affd. per curiam 199 F. 2d 373 certiorari denied 344 U.S. 927 (1953); Herbert Davis, 26 T.C. 49 (1956); Wade Motor Co., 26 T.C. 237 (1956); Utter-McKinley Mortuaries v. Commissioner, 225 F. 2d 870 (1955), affirming Memorandum Opinion of this Court. We stated the test in Roland P. Place, 17 T.C. 199, at p. 203: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. See section 23(a) (1)(A) of the Internal Revenue Code. When there is a close relationship *39 between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. In the opinion of the Fifth Circuit in Limericks, Inc., v. Commissioner, 165 F. 2d 483, 484, the court said: The statute contains no express limitation with respect to the reasonableness of the amounts as a condition to deduction, but rentals or other payments for the use of property which are excessive in amount, taking into consideration all the facts of the partciular case, do not constitute ordinary and necessary business expenses, or payments required to be made as a condition to the continued use of the property. When the corporation obtains the use of property by lease with the sole or controlling stockholder-owner it cannot be said the lease is the result of arm's length negotiations. The lessor is contracting with an entity that he owns or controls and it is necessary to scrutinize the lease to see if the payments are in reality required to be made as a condition *40 for the continued use of the lessor-stockholder's property. To the extent that the lessee's payments to its sole or controlling stockholder-lessor owner exceed the amount the corporation would be "required" to pay as rental for the use of the property if the lessor and lessee were dealing at arm's length, they are excessive and not deductible as rent. LeMoyne v. Commissioner, 47 F. 2d 539; Limericks, Inc., supra; Wade Motor Co., supra; Coe Laboratories, Inc., 34 T.C. 549, 585; Ray's Clothes, Inc., 22 T.C. 1332, 1337 (1954); Shaffer Terminals, Inc., 16 T.C. 356, 362 (1951), affd. 194 F. 2d 539 (C.A. 9, 1952). 1675 In Utter-McKinley Mortuaries, supra, where the sublease with the corporation provided for much higher rent than the sole stockholder paid the owners, the Court held the sole stockholder (McKinley) was acting for and as the agent of his corporation in leasing the property from the owners for business use by his corporation and the corporation was not "required" to pay anything more than he paid to obtain continued use of the property. The opinion states: The burden imposed *41 by the statute to permit deductions for rentals is onerous. Taxpayer must have proved to the trial court that the payments were wrung from it by compulsion of circumstances delineated by law. * * * Since McKinley was bound to give to this closely held corporation all the advantages which he obtained by his dealing in its behalf, any sums paid to him by the corporation above those paid by him to the Colemans were not a proper deduction. * * * To the same effect in Stanwick's Inc. In this case the sole stockholder rented the property used by the corporation and assigned the lease to his wife. The corporation's sublease was from the wife as sublessor at about twice the rent payable to the owners. We held only the rentals payable to the owners were required to be made as a condition to the continued use of the property for the business of the corporation and the excess over those amounts paid to the wife was not deductible as rent. The opinion states: The whole arrangement was superficial, artificial, and not an arm's length transaction between people having different interests dealing for some genuine business purpose. It was lacking in reality and was merely a device to reduce taxes. *42 What was said and held in the above cited cases is equally applicable in the instant case. Here there is more than one stockholder but the same absolute control of the lessee corporation by the lessors that was present in the last two above cited cases, is present here. This control was accomplished by the concert of leasing action by the stockholders and by tieing each one of the 55 shares of stock to one of the 55 licenses issued annually by the city. And the arrangement was such that in years after the year of organization the shares of stock and city licenses would always be paired with the city licenses to be issued to or in the name of each stockholder. The continued issuance of the 55 city licenses to the holders of the 55 shares means any payment designated as rent for a license will always operate as a payment per share of stock held by the stockholder-lessor. Petitioner, at the time it was organized in 1947, was the successor corporation to the individual proprietorships operated by the stockholders. The leases between petitioner and all of its shareholders were certainly not the result of any arm's length negotiation. Petitioner was created by the stockholders to operate *43 under their city licenses and carry on the sight-seeing businesses that they had been engaged in as individuals. The relationship was so close that the only conclusion that could be drawn is that the stockholders were in effect acting for and in behalf of the corporation they owned and controlled in securing for it the licenses it had been formed to use. These city licenses are secured for a $100 license fee to be paid to the city for each of the 55 licenses. The necessities of the business required that the city license fees be paid but it was not the necessities of the business that required petitioner to pay 12 to 15 times the amount of the license fee to the stockholders. Such payments to stockholders could not be said to be business expenses. The retal deduction statute is one subsection of the business deduction statute and as said in Limericks, Inc. v. Commissioner, supra: "The statute does not permit the deduction of an amount which is in no sense a legitimate business expense." We are of the opinion that under the record in this case the payments made to the stockholder-lessors were merely payments made under the guise of rent. The leases called the payments *44 rent but the leases were designed to distribute petitioner's earnings pro rata to its shareholders. The payments under the leases were clearly indirect distributions of the corporation's earnings. Any payments under the leases would be from earnings and as stated they would always be to each stockholder in proportion to the number of shares he owned. The leases could accomplish a distribution of earnings pro rata amongst stockholders of $137,500 ($2,500 maximum rental X 55). We hold the stockholder leases were nothing more than a device to measure the extent to which the holders of the 55 shares of stock were to share, in proportion to their stockholdings, in the earnings and profits of the corporation. Under the circumstances of this case it cannot be said petitioner was required to pay more than the annual license fees 1676 charged by the city (a total of $6,655 annually) to obtain the continued use of the 55 city sight-seeing licenses. This amount petitioner paid directly to the city each year and deductions for such payments have not been disallowed. The amounts petitioner paid to its stockholderlessors under the leases would not be proper deductions as rent under sec. 162, I.R.C. *45 of 1954. However, respondent has seen fit to allow petitioner a deduction of $600 per license per year or a total of $33,000 for each of the years involved. It is enough to say that we hold petitioner has not established it is entitled to more. It is stipulated petitioner took rental deductions for total rents paid to its stockholders for the leases of 55 city sight-seeing carriage licenses in the amounts of $66,000 in 1961, $74,250 in 1962, and $85,250 in 1963. Our holding means that the amounts above $33,000 or $33,000 in 1961, $41,250 in 1962, and $52,250 in 1963 which petitioner paid to its stockholders under the leases covering the 55 city sight-seeing carriage licenses are disallowed as business deductions under section 162, I.R.C. of 1954. The second group of leases were the leases with respect to the taxicabs and livery carriages. In this group there is one lessor of a livery license and two lessors of taxi licenses who are not stockholders of petitioner. The remaining lessors of 3 livery licenses in 1961, and 4 livery licenses in 1962 and 1963, and the lessor of one other taxi license in each of the three years were holders of petitioner's 4 shares *46 of Class B stock that were issued pursuant to an amendment to the Articles of Incorporation in 1958. We are of the opinion that the stipulated amounts paid to this group of lessors covering all the leases of livery and taxicab licenses were properly deductible. The record amply sustains a finding that petitioner was required to make the claimed rental payments it made each year to continue the use of the livery and taxicab licenses. The dealing here was at arm's length and the insignificant stock interest of four Class B shares held by some of the lessors does not make it otherwise. The negotiations for the leases preceded the issuance of stock. Actually the record shows close bargaining between petitioner and those who were operating individual businesses under the livery and taxicab licenses. It shows the Class B stock and in some instances a licensee's employment with petitioner were part of the deal that secured the initial leases. There is evidence that petitioner used these licensed vehicles for one year in a joint venture with the owners to arrive at a basis for the rental per vehicle and license it would pay. Unlike the sight-seeing carriage leases, these leases were for *47 a flat rent per year and they were from year to year. Although they remained unchange for many years, including the years in issue, the lessors could end them anytime. The lessors secured and paid for their city licenses each year and were not under any obligation to continue leasing their licenses to petitioner. The question is one of fact. Southern Ford Tractor Corporation, 29 T.C. 833; Potter Electric Signal and Manufacturing Co. v. Commissioner, 286 F. 2d 200 (1961). We hold for petitioner as to this second group of licenses. The stipulated amounts paid by petitioner during the years in issue, as rent for the livery and taxicab licenses, were deductible under section 162, I.R.C. of 1954. Petitioner introduced a State Court judgment against petitioner holding some 27 plaintiff-lessors of carriage leases, for a year after the years here involved, were entitled to $1,500 each under their leases and, since they had only been paid $600 each, judgment for $900 in favor of each lessor-plaintiff and against Mackinac Island Carriage Tours, Inc., defendant, was rendered. Petitioner argues this decision of the State court is legally binding *48 on this Court and means this Court must grant the deductions for the full amount paid under the leases during the years here involved. There is no merit in petitioner's argument. The issue here is not how much petitioner was obligated to pay the lessors under the leases but how much of what it did pay under said leases would be deductible under a Federal statute (sec. 162, I.R.C. of 1954) granting a deduction for rent or other payments made under certain circumstances set forth in the Federal statute. In Stanwick's, Inc., supra, we said: "The fact that the obligation would be enforceable between the parties does not make the payments deductible under section 23(a)(1)(A)." The judgment of the state court was of no significance in this case. 1677 As stated, we hold for respondent on the issues presented with respect to the first group of leases and for petitioner on the issues presented with respect to the second group of leases. Accordingly, Decision will be entered under Rule 50. Footnotes
1. Arthur T. Chambers, the president who was also one of the incorporators of petitioner, was asked what happened to the original 55 carriages that were leased to the corporation by the stockholders. He replied: A Some of them, we have stored. Some of them, we renovated. Some of them were not in a condition to be of any use. A good percentage of them we have put away. They are not usable. As we built a carriage - I shouldn't say built - As we renovated it or fixed it up, we identified it with the carriage that had been formerly turned in because we realized that in our lease that we were subject to return a suitable carriage, so those are all identified by numbers.↩
2. Arthur T. Chambers, the president of petitioner, testified as follows, in response to a few questions by the Court: THE COURT: Now, in your leasing of carriages and licenses, in the sightseeing carriages, for instance. Was the carriage very important? Or was it just the license and the seemingly unwritten law that the license would be renewed? Was the carriage important? THE WITNESS: The carriage wasn't important. Some of the carriages we took in were unusuable but the license was important. THE COURT: And you paid just as much rent for those that were unusable? THE WITNESS: That's right.↩
3. Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
4. In petitioner's income tax returns for the years involved deductions are taken for payment of "Licenses and fees" in the amount of $7,404 for 1961, in the amount of $7,516 in 1962, and in the amount of $7,504 in 1963.↩